JACK GRUBER (AND 6 OTHERS), PARTNERS T/A RARITAN ASSOCIATES, PLAINTIFFS-RESPONDENTS, AND MESTAL ESTATES, ETC., PLAINTIFF, v. THE MAYOR AND TOWNSHIP COMMITTEE OF THE TOWNSHIP OF RARITAN, *ET AL.*, DEFENDANTS-APPELLANTS.

———

JACK GRUBER (AND 6 OTHERS), PARTNERS T/A RARITAN ASSOCIATES, PLAINTIFFS-RESPONDENTS, v. THE MAYOR AND TOWNSHIP COMMITTEE OF THE TOWNSHIP OF RARITAN, DEFENDANTS-APPELLANTS.

Argued September 24, 1962—Decided December 3, 1962.

*Mr. Lawrence A. Carton, Jr.* argued the cause for the appellants (*Messrs. Roberts, Pillsbury & Carton,* attorneys).

*Mr. William R. Blair, Jr.* argued the cause for the respondents (*Messrs. Parsons, Canzona, Blair & Warren,* attorneys).

*Messrs. Harry L. Sears* and *Fred G. Stickel, III,* filed a brief *amicus curiae* on behalf of the New Jersey Institute of Municipal Attorneys.

The opinion of the court was delivered by

JACOBS, J.   The Law Division entered judgment for the defendants for the reasons expressed in its opinion reported at 68 *N. J. Super.* 118 (1961).   See 16 *Rutgers L. Rev.* 469 (1962).   The Appellate Division reversed and remanded the case for further proceedings not inconsistent with its opinion reported at 73 *N. J. Super.* 120 (1962).   We granted certification on the defendants' application.   37 *N. J.* 231 (1962).

In 1956 the plaintiffs-respondents' predecessor (Ze-Essex Realty) assembled a 131-acre tract in the Township of Raritan for residential development.   The tract was divided into five sections with a separate subdivision map for each section. The subdivision maps, along with a drainage plan, were prepared by Mr. Finnegan, a licensed engineer and surveyor who was also the Township Engineer.   On June 11, 1956 the Township Mayor advised Ze-Essex that his letter would serve as preliminary approval of the Ze-Essex Map prepared by Mr. Finnegan, "conditioned upon the tract being able to have sanitary sewer facilities and the lot sizes being 70 x 100." On July 27, 1956 the Township Committee adopted formal resolutions which approved the plats of sections 1, 2 and 3, contingent upon the execution of a developer's agreement, the posting of a performance bond, the construction of a sewage disposal plant, and the filing of the plats.   The resolutions set forth that the plats were to be filed within one year but contained no stated time limits for the performance of the other contingencies.   A contemporaneous resolution, adopted on July 27, 1956 by the Township Committee, authorized the formation of the Raritan Valley Sanitation Company, which was to construct and operate the disposal plant.   On August 23, 1956 a developer's agreement between the Township and Raritan Ridge, Inc. (apparently a purchaser under contract with Ze-Essex) was duly executed.   This agreement related to section 1 as did a performance bond which was executed on August 23, 1956 by Raritan Ridge and its surety.

While all of the foregoing was taking place the Township had no planning board ordinance or any ordinance regulating

land subdivision and the approval of the plats was evidently pursuant to the provisions of the old Map Act (*L.* 1953, *c.* 358). On October 1, 1956 the Township Committee adopted ordinances establishing a planning board and regulating land subdivision. *N. J. S. A.* 40:55–1.4, 40:55–1.14. On November 5 and 6, 1956 building permits and board of health permits were issued for the construction of four model homes in section 1. On November 12, 1956 a meeting of the Township Committee was held and during its course the Township Mayor reported that although sections 1, 2 and 3 had been officially approved by the Committee, official approval of sections 4 and 5 had been "inadvertently overlooked." He further reported that the Township Attorney had advised that the effective date of the land subdivision ordinance could be deferred to enable official approval of sections 4 and 5. Accordingly, the Township Committee adopted an amendatory ordinance which postponed the effective date of the land subdivision ordinance to December 12, 1956; in the interim, on December 7, 1956, the Township Committee adopted resolutions approving the plats for sections 4 and 5 with contingencies similar to those set forth in the earlier approvals of sections 1, 2 and 3.

In the early spring of 1957 work was begun on the four model homes in section 1 and there was testimony indicating that they were "85 to 90 per cent completed" by the fall of 1957. In addition curbs and sidewalks were placed in front of the homes, road grading and graveling was done, utility poles were installed, and some other work was completed during the spring of 1957. On July 25, 1957 the Township Committee adopted a resolution which extended until August 9, 1957 the time for executing the developer's agreement for sections 2 and 3 and the time for filing the plats for sections 1, 2 and 3. On August 7, 1957 the Township Committee further extended such times until November 1, 1957. On October 31, 1957 the developer's agreement relating to sections 2 and 3 was executed by Ze-Essex and the Township officials. Performance bonds were executed a day earlier by

Ze-Essex and the surety. Approval of sections 1, 2 and 3 was endorsed on the three plats on October 31, 1957 by the Mayor and Clerk of the Township and the plats were filed on November 1, 1957 in the Monmouth County Clerk's office. An endorsement by the Township Engineer on each of the plats certified that it conformed with "all the laws of the State and the municipal ordinances and requirements applicable thereto." On November 14, 1957 the Township Committee adopted a resolution extending the time for filing the plats of sections 4 and 5 until December 7, 1959. Although the resolution contained a reference to the installation of "the sewerage plant and other facilities," it set forth no time limitations with respect to their installation.

On July 14, 1958 the Township adopted its first zoning ordinance. The zoning map which accompanied the ordinance sketched the lots as laid out in sections 1, 2, 3, 4 and 5 and placed them in an area zoned for residential purposes. In addition the zoning ordinance contained a provision designed generally to protect the interests of developers who had obtained Township approval of their subdivision maps prior to the adoption of the zoning ordinance. In October 1958 the plaintiffs made arrangements to take over the development of the 131-acre tract which had remained relatively dormant since 1957. Some of them had an interest in the development from the start but before they took it over in its entirety they conferred with the Township officials and satisfied themselves that there would be no obstacles to their filing of plats for sections 4 and 5, to their completion of the model homes, and to their proceeding with the development. By December 1, 1958 the plaintiffs had acquired title to the entire tract and thereafter they proceeded expeditiously with steps towards its full development for residential purposes.

The testimony for the plaintiffs was that at the time of their acquisition of title they had made payments and had assumed obligations totaling about $440,000 and thereafter they became obligated to pay $68,000, making a total of payments or obligations in the sum of $508,000. In addition

they state that they agreed to indemnify a prior party in interest for such loss as it might suffer under a $100,000 bond it had executed in connection with the filing of the plats for sections 1, 2 and 3. There was further testimony that after acquiring title the plaintiffs commenced negotiations with an engineering firm for the construction of the proposed sewage treatment plant, with a water company in connection with the service of water to the development, with the Federal Housing Administration in connection with certain suggested modifications of plans, with the Board of Public Utility Commissioners in connection with rates to be charged by the Raritan Valley Sanitation Company for use of the sanitary sewage system, and with the Garden State Parkway in connection with the acquisition of an additional tract which was actually acquired on April 4, 1959. The four model homes were repaired and completed in October or November 1959 with an additional outlay of approximately $13,000.

On April 15, 1959 the Township's Planning Board adopted a resolution recommending that the subject property be rezoned. Thereafter, the Township Committee obtained an opinion from its attorney advising that it would be "on firm ground in attempting to rezone this area" and on August 19, 1959 the Planning Board recommended that the Township's zoning ordinance be amended to allow "light manufacturing exclusively and to prohibit residential use" in the area in question. The plaintiffs state that the first knowledge they had of the proposed rezoning was in August 1959. Pursuant to their request they were afforded the opportunity of appearing before the Planning Board in September 1959. At about that time the Raritan Valley Sanitation Company was advised by the State Department of Health that its application for approval of its proposed sewage disposal plant had been reviewed and that it might expect to receive "formal permits for construction and operation at an early date." In or about October 1959 the Board of Health of the Township received the plans and specifications for the proposed sewage treatment plant for its consideration and approval.

On November 23, 1959 the Township Committee adopted an ordinance which amended its zoning ordinance so as to permit light industry but to prohibit residences in a 157-acre tract which included the plaintiffs' 131 acres. In their proceeding in the Law Division the plaintiffs contended that the amendment, insofar as it sought to restrict their property to light industrial purposes, was arbitrary, capricious and unreasonable and that, in any event, they had acquired vested rights in the use of their property for residential purposes which could not be withdrawn by the later amendment. The Law Division determined (1) that in the light of the conflicting testimony in the record relating to the suitability of the area for light industrial purposes, the November 23, 1959 zoning amendment was not shown by the plaintiffs to be arbitrary, capricious or unreasonable and (2) that the plaintiffs' claim that they had acquired vested residential development rights which could not be withdrawn by the later amendment was without legal merit. See 68 *N. J. Super.*, at *pp.* 123, 129. On appeal, the Appellate Division determined that in view of all the circumstances, including the plaintiffs' expenditures and reliance and the unlikelihood of any demand for light industrial property in the area, the amendatory ordinance was unreasonable, arbitrary and confiscatory and must therefore be set aside. See 73 *N. J. Super.*, at *pp.* 130–132.

The November 23, 1959 zoning amendment was preceded by much study and discussion among the officials of the Township and the representatives of Community Planning Associates, a professional planning consultant which had been retained by the Township since 1957. In 1950 the Township, which covers an area of 5½ square miles, had a population of 2763. At that time much of its land was unused or used for agricultural purposes, and it had but a few commercial establishments. With the construction of the Garden State Parkway, which runs through the Township, its character began to change. By 1957 its population had increased to 7852 and by 1960 it had increased to 15,287. The residential

developments had, of course, increased rapidly and there was need for greatly expanded municipal services, particularly school facilities. The tax burden on residents became much heavier and the Township's professional consultant was of the opinion that in order "to balance the economic base of the community" the Township must seek commercial and industrial rather than residential tax ratables. In furtherance of this goal, the Planning Board recommended the creation of an exclusive light industrial zone and in selecting the land in question it was influenced, in considerable part, by the fact that the area was separated from the rest of the Township by the Garden State Parkway which could serve as a suitable buffer zone. See 68 *N. J. Super.*, at p. 121.

The plaintiffs contend that increase in tax ratables from industry and relief of school congestion were not permissible objectives within the Zoning Act. *R. S.* 40:55-32. That act provides that zoning regulations shall be in accordance with a comprehensive plan and designed for one or more of the following purposes: "to lessen congestion in the streets; secure safety from fire, panic and other dangers; promote health, morals or the general welfare; provide adequate light and air; prevent the overcrowding of land or buildings; avoid undue concentration of population." It is to be noted that within the borders of the statutory language, the zoning power may be exercised to promote the general welfare, a term which has received very broad definition in our State. See *Pierro v. Baxendale,* 20 *N. J.* 17, 28 (1955). In their efforts to create a better economic balance in the Township by stimulating industrial rather than residential development, the Township officials were seeking to advance the public welfare by alleviating the heavy tax burden and the harmful school congestion. So long as this was being done reasonably as part of and in furtherance of a legitimate comprehensive plan for the zoning of the entire municipality, it fell within the terms of *R. S.* 40:55-32. See *Ward v. Montgomery Tp.,* 28 *N. J.* 529, 535 (1959); *Newark, etc., Cream Co. v. Parsippany-Troy Hills Twp.,* 47 *N. J. Super.*

306, 328 (*Law Div.* 1957); cf. *Rockaway Estates v. Rockaway Tp.*, 38 *N. J. Super.* 468, 477 (*App. Div.* 1955); *Greenway Homes v. River Edge*, 137 *N. J. L.* 453, 456 (*Sup. Ct.* 1948). In *Ward v. Montgomery Tp., supra,* the court, in rejecting an attack on an ordinance as arbitrary, unreasonable 'and capricious, had this to say through Justice Francis:

"The conclusion is inescapable that the township was hungry for tax revenue. Manifestly, its fiscal picture was such that a new source of income would serve the general economic welfare. Pursuit of that objective was entirely worthy of the attention of the municipal fathers. And its achievement through land use regulation will not warrant judicial condemnation as long as it represents an otherwise valid exercise of the statutory zoning authority. If the amendment of the ordinance is compatible with and furthers a legitimate comprehensive plan for the zoning of the municipality within the contemplation of the statute, *N. J. S. A.* 40:55–32, it is legally unobjectionable. The fact that increased tax revenue is intended to result therefrom, or that an individual property owner may be benefited incidentally does not justify a charge of perversion of power. *Kozesnik v. Montgomery Twp., supra; Collins v. Board of Adjustment of Margate City*, 3 *N. J.* 200 (1949); *Rockaway Estates v. Rockaway Tp.*, 38 *N. J. Super.* 468 (*App. Div.* 1955); *Greenway Homes v. Borough of River Edge*, 137 *N. J. L.* 453, 456 (*Sup. Ct.* 1948)." 28 *N. J.,* at *pp.* 535, 536.

Similarly, in *Newark, etc., Cream Co. v. Parsippany-Troy Hills Twp., supra,* Justice Hall, then a member of the Superior Court, gave the following answer to an inquiry whether an ordinance was valid where it had the avowed purpose of maintaining the essential residential character of the community along with the encouragement of industry in appropriate areas, thereby securing "a future balanced land use leading to a sound municipal economy by non-residential tax ratables contributing to the cost of necessary municipal services for all":

"Is a zoning classification based upon such a purpose and intent a valid exercise of zoning power? I think it is. Zoning is one aspect of the sovereign police power. Such power is not limited to measures directly needful to serve the public health, morals and safety. It may also be invoked to serve the public convenience and general prosperity

and well-being. *Mansfield and Swett, Inc. v. West Orange, supra,* 120 *N. J. L.,* at *page* 153; *Pierro v. Baxendale,* 20 *N. J.* 17, at *page* 28 (1955). The essence of zoning is to provide a balanced and well-ordered scheme for all activity deemed essential to the particular municipality. *Berdan. v. City of Paterson,* 1 *N. J.* 199, 205 (1948); *Kozesnik v. Township of Montgomery,* 24 *N. J.* 154 (1957). Subject to the rule of reason, the kind of community and the kind of balance is exclusively a matter for local legislative determination. *Duffcon Concrete Products v. Borough of Cresskill,* 1 *N. J.* 509 (1949). I conclude that a zoning scheme seeking balanced land use to obtain a sound municipal economy by encouraging industry on which taxes may be levied to help meet the deficit in the cost of municipal services to home owners is a proper exercise of the zoning power, subject always to the reasonableness of the classification and regulations enacted to achieve the end both generally and with respect to particular property." 47 *N. J. Super.,* at *p.* 328.

See 1 *Rathkopf, Zoning and Planning, Chapter* 10 (3d ed. 1960).

The Law Division found from the evidence that the rezoning was in keeping within a comprehensive plan and we see no occasion for disturbing its finding. See 68 *N. J. Super.,* at *p.* 129. The comprehensive plan evidenced in the original zoning ordinance was not immutable and could reasonably be altered either because of changed circumstances or because of changed viewpoints as to the needs and interests of the entire community. See *Kozesnik v. Montgomery Twp.,* 24 *N. J.* 154, 167 (1957); *Hochberg v. Borough of Freehold,* 40 *N. J. Super.* 276, 286 (*App. Div.* 1956); *cf. S & L Associates, Inc. v. Washington Twp.,* 61 *N. J. Super.* 312, 327 (*App. Div.* 1960), modified 35 *N. J.* 224 (1961). See also *Rodgers v. Village of Tarrytown,* 302 *N. Y.* 115, 96 *N. E. 2d* 731, 733 (1951); Haar, "In Accordance with a Comprehensive Plan," 68 *Harv. L. Rev.* 1154, 1166 (1955). The fact that the comprehensive plan, as altered, included a designated area dedicated to light industry to the exclusion of residential uses may not be viewed as a legal deficiency, so long as the test of the overall reasonableness was satisfied. See *Fanale v. Hasbrouck Heights,* 26 *N. J.* 320, 328 (1958); *Kozesnik v. Montgomery Twp., supra,* 24 *N. J.,* at *p.* 169; but *cf. Katobimar Realty Co. v. Webster,* 20 *N. J.* 114 (1955).

More troublesome was the question of whether the demands of light industry for the area were so negligible or unlikely that restriction of the property to that use was unreasonable or confiscatory and therefore invalid. *Cf. Vernon Park Realty v. City of Mount Vernon,* 307 *N. Y.* 493, 121 *N. E. 2d* 517 (1954); *Opgal, Inc. v. Burns,* 20 *Misc. 2d* 803, 189 *N. Y. S. 2d* 606 (*Sup. Ct.* 1959), aff'd 9 *N. Y. 2d* 659, 212 *N. Y. S. 2d* 74, 173 *N. E. 2d* 50 (1961). The evidence relating to that issue may be found summarized in the opinion of the Law Division (68 *N. J. Super.,* at *p.* 125), and the opinion of the Appellate Division (73 *N. J. Super.,* at *p.* 130) and need not be detailed here. Suffice it to say that the expert testimony differed sharply and that the state of record was such as to justify the Law Division's conclusion that the plaintiffs had not carried their acknowledged burden of showing that the confinement of the area to light industry was unduly restrictive and therefore unreasonable or confiscatory. In this connection it must be borne in mind that the Township was entitled to the benefit of the presumption of validity which attached to the zoning ordinance and which could be overcome only by an affirmative showing of unreasonableness, arbitrariness or capriciousness. See *Kozesnik v. Montgomery Twp., supra,* 24 *N. J.,* at *p.* 167; *Pierro v. Baxendale, supra,* 20 *N. J.,* at *p.* 26. It must also be borne in mind that the Law Division's finding that the plaintiffs' burden had not been carried would not preclude later proceedings, for subsequent events bearing on actual demands for the property or the lack thereof may well be such as to make the right determination crystal clear. *Cf. Pierro v. Baxendale, supra,* 20 *N. J.,* at *p.* 29; *Lionshead Lake, Inc. v. Township of Wayne,* 10 *N. J.* 165, 172 (1952), appeal dismissed 344 *U. S.* 919, 73 *S. Ct.* 386, 97 *L. Ed.* 708 (1953); *Fischer v. Township of Bedminster,* 11 *N. J.* 194, 205 (1952).

We come now to the issue of whether the course of conduct between the plaintiffs and their predecessors on the one hand and the public officials on the other hand gave rise, under principles of equitable estoppel, to vested residential develop-

ment rights which could not be withdrawn by the later zoning amendment. In the Law Division the court entertained the view that the actions of the Township in conditionally approving the plats submitted by the plaintiffs' predecessors and in thereafter granting extensions of time for the filing of the plats and the related instruments were *ultra vires* and of no effect whatever. On the basis of that view the Law Division took the position that the plaintiffs' expenditures and reliance gave rise to no vested rights. See 68 *N. J. Super.,* at *pp.* 130–134. In the Appellate Division the court properly pointed out that if private persons had engaged in dealings such as those engaged in by the parties here, an equitable estoppel would undoubtedly arise. See 73 *N. J. Super.,* at *p.* 126. It found it unnecessary to determine whether an equitable estoppel arose against the Township since it held the view that the zoning amendment, when considered in the light of the plaintiffs' expenditures and reliance and the evidence relating to any likelihood of demand for industrial property in the area, was unreasonable, arbitrary and confiscatory. See 73 *N. J. Super.,* at *pp.* 130–132. However, in the course of its opinion it did refer to the legal writings and judicial decisions which indicate the strong recent trend towards the application of equitable principles of estoppel against public bodies where the interests of justice, morality and common fairness clearly dictate that course. See 73 *N. J. Super.,* at *pp.* 126–128; Berger, "Estoppel Against the Government," 21 *U. Chi. L. Rev.* 680, 681, 707 (1954); Pillsbury, "Estoppel Against the Government," 13 *Bus. Law.* 508, 513 (1958); *Vogt v. Borough of Belmar,* 14 *N. J.* 195 (1954); *Johnson v. Hospital Service Plan of N. J.,* 25 *N. J.* 134 (1957); *Summer Cottagers' Ass'n of Cape May v. City of Cape May,* 19 *N. J.* 493 (1955); *Tremarco Corporation v. Garzio,* 32 *N. J.* 448 (1960); *cf. Levin v. Livingston Tp.,* 35 *N. J.* 500, 520 (1961); *Hilton Acres v. Klein,* 35 *N. J.* 570, 583–584 (1961). See also *Telimar Homes v. Miller,* 14 *App. Div. 2d* 586, 218 *N. Y. S. 2d* 175 (1961); *Town of Hempstead v. Lynne,* 32 *Misc. 2d* 312, 222 *N. Y. S. 2d* 526 (*Sup. Ct.*

1961); *Ward v. City of New Rochelle*, 20 *Misc. 2d* 122, 197
*N. Y. S. 2d* 64 (*Sup. Ct.* 1959), aff'd 9 *App. Div. 2d* 911,
197 *N. Y. S. 2d* 128 (1959), aff'd 7 *N. Y. 2d* 1026, 166 *N. E.
2d* 859 (1960); *Elsinore Property Owners Ass'n v. Mor-
wand Homes*, 286 *App. Div.* 1105, 146 *N. Y. S. 2d* 78 (1955).

In *Vogt v. Borough of Belmar, supra,* the Borough adopted
an ordinance which provided for a volunteer fire department.
The ordinance made provision for active firemen over the age
of 21 but contained no reference whatever to junior firemen
under that age. However, the services of junior firemen were
availed of for many years and when one of them was injured
he filed a claim for compensation which was resisted by the
Borough. In holding that the Borough was estopped, the
court noted that it would be contrary "to the plainest prin-
ciples of justice," to permit the Borough "to invoke the for-
mal requisites of local law" to defeat the claim for compensa-
tion. In the course of his opinion for the court, Justice
Heher had this to say:

"In respect of matters within the realm of its general power and
authority, a municipal corporation is ordinarily subject to the doctrine
of estoppel *in pais* to serve the demands of right reason and justice,
at least where the invocation of the rule would not hinder or
prejudice essential governmental functions, and especially where the
irregularity or deficiency is largely technical or formal and not of
the jurisdiction. *Town of Essex v. New England Telegraph Co.*, 239
*U. S.* 313, 36 *S. Ct.* 102, 60 *L. Ed.* 301 (1915). While not applied
as freely against the public as in the case of private individuals, the
doctrine of estoppel may be invoked against a municipality to prevent
manifest wrong and injustice. *City of Los Angeles v. Los Angeles
County*, 9 *Cal. 2d* 624, 72 *P. 2d* 138, 113 *A. L. R.* 370 (*Sup. Ct.*
1937)." 14 *N. J.*, at *p.* 205.

In *Summer Cottagers' Ass'n of Cape May v. City of Cape
May, supra,* the city sold land without complying with the
statutory procedures relating to public notice and free com-
petitive bidding. After a motel being constructed on the
land was practically completed, some citizens sought to void
the sale of the land. In invoking principles of estoppel to
bar the attack on the sale, the court pointed to the distinction

between an act which is utterly beyond the jurisdiction of a municipality and an act which involves an irregular exercise of a basic power possessed by the municipality. The former was said to be *ultra vires* in the primary sense and void but the latter was said to be *ultra vires* only in a secondary sense which would not preclude ratification or "the application of the doctrine of estoppel in the interest of equity and essential justice." 19 *N. J.*, at *p.* 504. See also 10 *McQuillin, Municipal Corporations* § 29.10, *p.* 195 (*3d ed.* 1950). In *Johnson v. Hospital Service Plan of N. J., supra,* the court applied doctrines of estoppel and ratification to bar the City of Newark from disavowing a contract which had been made by its medical director without authority but had been in actual operation for over 10 years; in concluding his opinion for the court, Justice Wachenfeld expressed the thought that it would be grossly unjust not to make municipalities reasonably amenable "to fair standards of conduct in their transactions with outsiders." 25 *N. J.*, at *p.* 144.

In *Tremarco Corporation v. Garzio, supra,* the Township of Ewing issued a permit to the plaintiff to build a public garage and a gasoline station. Construction contracts were entered into, gas tanks were delivered and monies were expended for title and architectural work. Thereafter an amendment precluding the plaintiff's proposed use of its premises was passed. In dealing with the issue of whether the plaintiff should be permitted to proceed despite the later amendment, the court, through Justice Schettino, pointed out that the ultimate objective was fairness to both the public and the individual property owner and that it was necessary to strike a proper balance between the interests of the plaintiff and the right and duty of the municipality to promote the public welfare of the community through proper planning and zoning. Being satisfied "that the equities strongly predominate in favor of the plaintiff," the court held that it should be permitted to proceed with construction under its permit. See 32 *N. J.*, at *p.* 458; *Sautto v. Edenboro Apartments, Inc.,* 69 *N. J. Super.* 420, 429 (*App. Div.* 1961).

Although out-of-state cases are not controlling, they do have pertinence in illustrating the judicial efforts which are widely being extended towards attaining basic fairness in dealings between public bodies and private developers. In *Elsinore Property Owners Ass'n v. Morwand Homes, supra,* the Appellate Division of the New York Supreme Court passed on the applicability of a later zoning amendment to a prior residential development. The developer had filed a plat and a performance bond pursuant to New York law. It constructed some homes and conveyed the unsold lots to another developer. Before the sale, the city's zoning ordinance was amended to increase the prescribed minimum area to 10,000 square feet. In holding that this amendment could not apply to the premises in question, the court noted that the developer and its successor. "had a vested right to complete the development as planned." See 146 *N. Y. S. 2d,* at *p.* 81; cf. *Lake Intervale Homes, Inc. v. Parsippany-Troy Hills,* 28 *N. J.* 423, 432 (1958) ; *State v. Dodge,* 113 *Ohio App.* 118, 177 *N. E. 2d* 515, 519 (1960).

Similarly in *Telimar Homes, Inc. v. Miller, supra,* a developer acquired a tract of land for subdivision and development. The tract was divided into four sections and the map of the first section providing for quarter-acre lots was approved by the officials of the town. Thereafter roads were constructed, model homes were built and a water company was organized. A map of the second section was also approved but shortly thereafter the town amended its zoning ordinance to require minimum lots of a half acre. When the plaintiff submitted its maps for the third and fourth sections providing for quarter-acre lots they were disapproved. In holding that the developer had a right to proceed with respect to all four sections without regard to the zoning amendment, the court had this to say:

"It is clear from this record that the water system, roads, drainage system, model house construction and advertising were laid out and designed for the benefit of all four sections developed as a single, overall tract; that they would have been laid out and treated on an

entirely different basis if the development of each section were to be separate; and that, prior to the zoning amendment, substantial construction had been commenced and substantial expenditures had been made in partial development of sections three and four, as well as sections one and two. Hence, plaintiff acquired a vested right to a nonconforming use as to the entire tract (see: *Elsinore Property Owners Ass'n v. Morwand Homes,* 286 *App. Div.* 1105, 146 *N. Y. S. 2d* 78)." 218 *N. Y. S. 2d,* at *p.* 177.

See *River Forest State Bank v. Village of Hillside,* 6 *Ill. 2d* 451, 129 *N. E. 2d* 171, 173 (1955); *District of Columbia v. Cahill,* 60 *App. D. C.* 342, 54 *F. 2d* 453, 454 *(D. C. Cir.* 1931).

We are not concerned with a residential development which originated after the adoption of the municipal ordinance establishing the planning board and regulating land subdivision. *Cf. Levin v. Livingston Tp., supra; Hilton Acres v. Klein, supra.* Nor are we concerned with a situation in which the developer is seeking to avoid conditions imposed by the municipality in connection with its approval of the residential development. *Cf. Magnolia Development Co., Inc. v. Coles,* 10 *N. J.* 223 (1952); *Reid Development Corp. v. Parsippany-Troy Hills Tp.,* 10 *N. J.* 229 (1952). We are here confronted with a case in which the development originated before the municipality had any planning board or land subdivision ordinance and in which the developer (and his successors) prosecuted the development thereafter with substantial efforts and expenditures and with consistency though "haltingly and with interruptions." 73 *N. J. Super.,* at *p.* 128. It is significant that when there were interruptions the municipality did nothing whatever towards expedition of the development nor did it do anything to suggest to the developer that his interests would be in jeopardy if he did not proceed in faster fashion. On the contrary, the municipality granted formal approvals and extensions which on their face avoided defaults and justified the developer's reliance. Although the Law Division was of the opinion that these approvals and extensions were wholly *ultra vires* in the primary sense and therefore could not furnish any support whatever for the claim of equitable estoppel or vested rights, we do not

so regard them. *Cf. Vogt v. Borough of Belmar, supra; Summer Cottagers' Ass'n of Cape May v. City of Cape May, supra.*

When the development originated there were no significant questions of irregularity or want of municipal power. The tract was assembled and subdivided, informal and formal approvals were obtained, a developer's agreement was executed, a performance bond was filed, and building and board of health permits were issued for the construction of model homes. When the ordinances establishing a planning board and regulating subdivision were adopted all concerned considered that the development was to be deemed as already properly under way and was not to be affected by the terms of the ordinances. That issue was a doubtful one (*cf. Lake Intervale Homes, Inc. v. Parsippany-Troy Hills, supra,* 28 *N. J.,* at *p.* 432; Cunningham, "Control of Land Use in New Jersey," 15 *Rutgers L. Rev.* 1, 29–30 (1960)) though it would seem clear that, in the subdivision ordinance itself, the Township could have designated developments under way as an exempt class within the contemplation of *N. J. S. A.* 40:55–1.14. Although this was not done, we have already indicated our view that the course which was actually followed thereafter in good faith may not, either justly or under the precedents, be considered as a nullity and utterly void conduct incapable of serving as a basis for the claim of equitable estoppel or vested rights. *Cf. Vogt v. Borough of Belmar, supra,* 14 *N. J.,* at *p.* 205; *Summer Cottagers' Ass'n of Cape May v. City of Cape May, supra,* 19 *N. J.,* at *p.* 506.

The Township has advanced technical arguments which need not detain us since they have little substance and no relation to the equities of the case. The fact is that it is seeking to disavow its commitments to a developer with whom it has not dealt at all fairly. When it belatedly became alarmed at its residential growth, it did not seek to work out a reasonable solution with the developer which might have reduced the number of planned houses and at the same time have permitted the developer to proceed so as to retrieve its

investment with a reasonable return. *Cf.* "Legal and Illegal Methods for Controlling Community Growth on the Urban Fringe," 1961 *Wis. L. Rev.* 370. Instead, it abruptly took action which was designed to exclude all residential building and occupancy, even in section 1 where four model homes had already been built, curbs and sidewalks had been placed, road grading and graveling had been done, utility poles had been installed, and other work had been completed. Insofar as section 1 is concerned, the plaintiffs' claim for relief rests firmly on elemental considerations of justice and comes well within the equitable principles expressed in *Tremarco Corporation v. Garzio, supra.* And it may very well be that the plaintiffs' claim should also be sustained with respect to some or all of the remaining sections within the principles expressed as to sectional developments in *Telimar Homes, Inc. v. Miller, supra.* However, we are not now prepared to determine that issue because of the somewhat uncertain state of the record and the absence of any findings in the Law Division. There are vital public as well as private interests and we believe that the safer course would be to remand the case to the Law Division for its findings and determination after the taking of more detailed testimony, particularly with respect to the precise nature and extent of the plaintiffs' expenditures and good faith reliance and the practicability and fairness of restricting the residential development to any section or sections less than the entire tract. Since the Appellate Division properly reversed the Law Division its judgment is:

Affirmed and the cause is remanded for further proceedings in conformity with this opinion. No costs.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.