795 A.2d 895 (2002)
350 N.J. Super. 420
BONAVENTURE INTERNATIONAL, INC. t/a The Sandpiper Restaurant, Plaintiff-Appellant,
v.
BOROUGH OF SPRING LAKE, Spring Lake Board of Adjustment and Mr. & Mrs. Charles Brennan, Mr. & Mrs. Richard Kappy, Mr. & Mrs. Nazar Nazarian, Mr. & Mrs. Lawrence Raia, and Mr. & Mrs. Thomas Saboy, Defendants-Respondents.
Mr. & Mrs. Charles Brennan, Mr. & Mrs. Richard Kappy, Mr. & Mrs. Nazar Nazarian, Mr. & Mrs. Lawrence Raia, and Mr. & Mrs. Thomas Saboy, Plaintiffs-Appellants,
v.
Borough of Spring Lake Planning Board and Bonaventure International, Inc. t/a The Sandpiper Restaurant, Defendants-Respondents.
Nos. A-0582-01T5, A-1475-01T5.[1]
Superior Court of New Jersey, Appellate Division.
Argued March 27, 2002.
Decided April 30, 2002.
*897 Robert C. Shea, Toms River, argued the cause for appellant/respondent Bonaventure International, Inc. (R.C. Shea & Associates, attorneys; Mr. Shea, of counsel; Michael C. Paxton, on the brief).
Kevin B. Thomas, Manahawkin, argued the cause for respondents/appellants Brennan, Kappy, Nazarian, Raia and Saboy.
George D. McGill, Belmar, argued the cause for respondent Planning Board of Spring Lake (Pringle Quinn Anzano, attorneys; Mr. McGill, on the brief).
Walter W. Schoenewolf, Borough Attorney, argued the cause for respondent Borough of Spring Lake.
Before Judges KING, CUFF and WECKER.
*896 The opinion of the court was delivered by CUFF, J.A.D.
This appeal involves an on-going dispute between the owner of a restaurant located in a residential neighborhood and owners of neighboring homes. Over the years, the scope of operations has expanded and intensified without benefit of any variances or site plan review. We review an order which equitably estops the Borough from issuing a cease and desist order to the restaurant, a nonconforming use in a residential *898 zone, but which also imposes conditions on the restaurant's operation. With the exception of a modification of the conditions, we affirm.

I
The following facts were developed during eight days of testimony before the Planning Board.[2] Plaintiff Bonaventure International, Inc. (Bonaventure) is the owner of a 96-seat restaurant known as The Sandpiper Restaurant (The Sandpiper) located in Spring Lake, Monmouth County. The restaurant is open for breakfast, lunch and dinner and is also available for a variety of private functions, such as weddings, christenings and showers. The operators of the restaurant also provide off-premises catering.
The Sandpiper is located one-half block from the oceanfront in the midst of a residential neighborhood. Defendants Brennan, Kappy, Nazarian and Saboy reside next to, across the street from, or two houses away from the restaurant.[3]
It is undisputed that the restaurant and the Atlantic Hotel in which it is located were conforming uses until 1975 when the area was rezoned to allow only residential uses. In fact, the homes occupied by defendants Kappy and Saboy were erected on the site of the former Monmouth Hotel. The record developed before the Planning Board reveals that in 1975, the owners of the Atlantic Hotel served meals to the occupants of the hotel, usually no more than ten. No meals were served to the public. Furthermore, from 1970 until 1978, the area in which the meals were served was leased to the operator of a nursery school in the off-season, September to May.
In 1982, the son of the owner of the hotel, opened the restaurant to the public. The mercantile license application filed in 1982 stated that the restaurant had 40 seats. The testimony before the Planning Board established that the owner/operator utilized only the eastern half of the ground floor for the restaurant. Defendant Saboy testified that when the restaurant initially opened to the public in 1982, he asked the zoning officer whether it was permitted to serve the public. He was informed that the hotel/restaurant was grandfathered.
Between 1982 and 1985, the restaurant gradually expanded from 40 to 60 seats. In December 1986, the hotel/restaurant was sold to KTI Realty, Inc. (KTI). Prior to acquiring the property, Brooke Tarabour, a KTI partner, met with Sylvester Carroll, the Zoning Officer. She was informed that the fire code would allow a 90seat restaurant. Tarabour also met with the building inspector who, according to her, raised no zoning concerns. In June 1987, after renovating the kitchen, Tarabour filed an Application for a Retail Food Establishment License which stated that only dinner would be served in the 88-seat restaurant. In 1987, the restaurant occupied the east and west sides of the ground floor of the hotel.
In 1987, KTI also applied for a variance to expand the restaurant at the site. KTI sought to add a deck to the entrance and allow outdoor seating; it also sought to slightly expand the hotel accommodations. It did not seek leave to expand the indoor seating. Some of the defendants objected *899 and the Board of Adjustment denied the application. The resolution adopted by the Board of Adjustment acknowledged that the use was nonconforming and that it contained a 96-seat restaurant.
In 1988, KTI filed another application for variances to make improvements to the site, including the installation of a swimming pool. Once again, defendants and others opposed the application and the Board of Adjustment denied relief. The resolution adopted by the Board of Adjustment referred to the use as nonconforming and recited that the restaurant contained 96 seats. KTI appealed the denial. The litigation was eventually settled; the resolution adopted by the Board of Adjustment memorializing the settlement referred to the restaurant as a nonconforming use with 96 seats.
Between 1989 and 1991, the property was sold and converted to a condominium. The hotel became one unit; the restaurant was a second unit. As part of the condominium conversion, the driveway and the limited off-street parking which served the site were designated a common element of the hotel. In 1991, Bonaventure acquired only the restaurant. The restaurant is barred by the condominium agreement from parking cars or receiving deliveries on-site. When Bonaventure commenced operation of the restaurant in 1992, it not only offered ą la carte dining in the 96seat restaurant but also began to accept bookings for events such as weddings, showers and christenings which occupied all or a substantial portion of the premises. It also started to offer off-premises catering.
In 1994, Bonaventure acquired a liquor license and sought to transfer the license to The Sandpiper. In the face of considerable opposition from neighbors, including defendants, the application was denied. The resolution denying the transfer acknowledged the nonconforming nature of the 96-seat restaurant.
Based on information developed during their opposition to the liquor license transfer application, defendants wrote to the Zoning Officer and requested the issuance of a cease and desist order until The Sandpiper obtained a use variance. In their January 24,1997 letter, defendants related that the area in which The Sandpiper is located was a nursery school when the zoning ordinance was amended in 1975. The Borough Attorney responded on February 7, 1997, denying their request and citing the accessory use and entire controversy doctrines. Defendants renewed their request to the Mayor and Council in a letter dated May 22, 1997. On July 9, 1997, the Zoning Officer responded that the owners of the hotel and restaurant had never abandoned the restaurant operation because they operated a restaurant during each summer season. Therefore, he opined there was no need for the current owners of the restaurant to apply for a variance.
Defendants then filed an application with the Planning Board to appeal the decision of the Zoning Officer. They requested the Planning Board to compel the Zoning Officer to issue a cease and desist order. On December 19, 1997, Bonaventure filed a verified complaint and order to show cause in the Superior Court, Law Division. In its complaint, Bonaventure claimed that the proceeding before the Planning Board was barred due to defendants' lack of standing and lack of jurisdiction. Bonaventure also invoked various equitable doctrines, including entire controversy, equitable estoppel, and laches.
In a letter opinion dated January 13, 1998, Judge D'Amico denied without prejudice Bonaventure's application to proceed in a summary fashion to enjoin the individual defendants' appeal before the Planning *900 Board. The parties and the court agreed that the matter would proceed before the Planning Board regarding the jurisdictional issues contained in the complaint. The court retained jurisdiction.
After hearing arguments from both parties, the Planning Board by resolution dated April 8, 1998, denied the jurisdictional challenges raised by plaintiff, and allowed the matter to proceed on the merits of the application. The matter returned to Judge D'Amico, who affirmed the Planning Board's April 8, 1998 rulings that defendants had standing to bring the appeal, the appeal was timely, and neither the entire controversy doctrine nor res judicata barred the application. The court retained jurisdiction of the issue of equitable estoppel and remanded for development of a factual record before the Planning Board.
The Planning Board held hearings on May 12, July 14, August 11, September 8, December 8, 1999, January 12, May 10, July 12, and October 11, 2000. During these hearings, defendants testified concerning not only the history of the Atlantic Hotel/The Sandpiper but also the impact on the neighborhood from the intensification of the use, particularly following 1991. They testified that there were few, if any, banquets at the restaurant during KTI's ownership and operation. Tarabour confirmed these observations. She testified that KTI operated The Sandpiper almost exclusively as an ą la carte restaurant. She stated that banquets and other special events accounted for no more than one to two percent of her business. Furthermore, she served only dinner when she operated the restaurant.
Defendants related that Bonaventure offers breakfast and also uses the restaurant for banquets and other special events. The record reveals that over 50% of Bonaventure's business is attributable to banquets and special events. Defendants contended that the expanded scope of operations significantly changed the impact of the operation on the neighborhood. They recounted that as an ą la carte restaurant, the clientele would come and go over the course of the evening. However, when the restaurant is taken over by one group for a special event, all of the guests tend to arrive within a few minutes of each other, stay longer and later than regular dinner patrons, and leave within minutes of each other. The noise and traffic generated by these arrivals and departures has significantly increased the noise and traffic in the neighborhood.
Tarabour also testified that delivery trucks utilized the driveway when KTI operated the restaurant. By contrast, defendants testified, and Bonaventure offered no evidence to the contrary, that delivery trucks do not use the driveway and must park on the street to unload. The trucks often double-park. Furthermore, throughout Bonaventure's operation of the restaurant there has been no on-site parking for patrons.
Defendants also established that Bonaventure offers off-premises catering. The service is based at the restaurant and generates traffic from delivery trucks and the vehicles associated with the catering. It is undisputed that off-premises catering was first introduced during Bonaventure's ownership and operation.

II
Following the completion of the testimony, the Planning Board found that the restaurant was a nonconforming use and it had been since 1975. It also found the nonconformity had expanded over the years without the requisite approvals by the appropriate municipal boards. Nevertheless, the Planning Board found that municipal action and inaction over the years in the face of the expansion and intensification of the nonconformity barred *901 the issuance of a cease and desist order at this late date. It adopted a resolution memorializing those findings on November 8, 2000.
Having retained jurisdiction of the issue of equitable estoppel pending development of the record before the Planning Board, Bonaventure returned to the Superior Court for review of this determination. In addition, defendants filed a separate action in lieu of prerogative writs contesting the November 2000 resolution. Both matters were assigned to Judge Patrick McGann, Jr.
Judge McGann issued a written opinion in the Bonaventure appeal on June 27, 2001, in which he affirmed the Planning Board's disposition that it was equitably estopped from requiring Bonaventure to apply for a use variance to operate a 96seat restaurant. He found, however, that the Planning Board did not consider the expansion and intensification of the nonconformity since 1991 with the introduction of banquet operations and off-premises catering. Thus, Judge McGann ordered that Bonaventure may not conduct any of the following activities until it receives a use variance:
1. Catering off-premises.
2. Catering of private parties on premises such as Engagement Parties, Weddings, Rehearsal Dinners, Bridal and Baby Showers, Anniversary Parties, and the like.
3. No loudly played music on premise either live or pre-recorded other than that specified above.
4. No "special events" to bring patrons into the restaurant.
5. Since it is a restaurant and not a cabaret, therefore, no dancing is permitted on the premises.
Judge McGann dismissed the appeal filed by defendants as moot. It is from these orders that Bonaventure and defendants appeal.
On appeal, Bonaventure argues that Judge McGann erred in holding that certain specified activities at The Sandpiper require a use variance. Bonaventure also contends that defendants' appeal to the Planning Board was untimely, that Judge D'Amico erred when he held that the entire controversy doctrine and res judicata did not bar defendants' application before the Planning Board.
Defendants argue that the trial judge erred in applying the doctrine of equitable estoppel. They contend that the restaurant is not a legal nonconforming use. Implicitly, they also contest the dismissal of their appeal of the Planning Board action as moot. Defendant Borough of Spring Lake has not taken a position on the merits but has informed the court of the difficulty it has encountered in enforcing the trial court order. Defendant Planning Board suggests that a remand to it may be in order to allow it to specifically consider the issue of intensification since Bonaventure commenced operation of the restaurant.

III
When a municipality adopts a zoning ordinance or when an existing zoning ordinance is changed, inevitably there will be uses which are newly prohibited and structures which do not conform with the bulk requirements. These are known as nonconforming uses and structures respectively. As in this case, a nonconforming structure may house a nonconforming use. Under the Municipal Land Use Law (the MLUL), a nonconforming use or structure is deemed to have acquired a vested right to continue in such form despite the zoning provisions. N.J.S.A. 40:55D-68 provides:
Any nonconforming use or structure existing at the time of the passage of an ordinance may be continued upon the lot or in the structure so occupied and any *902 such structure may be restored or repaired in the event of partial destruction thereof.
The statutory protection is not without limitations. Because nonconforming uses are inconsistent with the current zoning, the nonconformity should be reduced to conformity as quickly as possible. Hay v. Board of Adjustment, 37 N.J.Super. 461, 464, 117 A.2d 650 (App.Div.1955). Municipalities may also impose limitations on nonconforming uses. Such restrictions may relate to change of use, the enlargement or extension of nonconforming structures, and limitations on the duration of nonconforming uses when the use is abandoned or discontinued. Town of Belleville v. Parrillo's, Inc., 83 N.J. 309, 315, 416 A.2d 388 (1980). The method generally used to limit nonconforming uses is to prevent any increase or change in the nonconformity. Id. at 316, 416 A.2d 388.
A prior nonconforming use is ordinarily restricted to its character and scope at the time the ordinance making it a nonconforming use was enacted. The structure containing the nonconforming use may be maintained or repaired. Grundlehner v. Dangler, 29 N.J. 256, 263, 148 A.2d 806 (1959). The use may not be enlarged as of right except when the change is negligible or insubstantial. Palatine I v. Planning Bd., 133 N.J. 546, 565, 628 A.2d 321 (1993); Belleville, supra, 83 N.J. at 316, 416 A.2d 388; McDowell, Inc. v. Board of Adjustment, 334 N.J.Super. 201, 214, 757 A.2d 822 (App.Div.2000), certif. denied, 167 N.J. 88, 769 A.2d 1051 (2001). Where there is doubt whether the enlargement or change is substantial rather than insubstantial, the courts have consistently declared that the dispute is to be resolved against the enlargement or change. Belleville, supra, 83 N.J. at 316, 416 A.2d 388.
The burden of proving the existence of a nonconforming use is upon the party asserting such use. Ferraro v. Zoning Bd., 321 N.J.Super. 288, 291, 728 A.2d 863 (App.Div.1999). One commentator has emphasized that "[i]t is important that the evidence presented to the board establish exactly what the use was at the time of adoption of the ordinance, its character, extent, intensity and incidents." William M. Cox, New Jersey Zoning and Land Use Administration, Ch. 11-2.2 at 254 (2002).
At the time of the hearing on the nature of the use, it may already have changed from what it was at the time of the adoption of the ordinance. The issue is whether the present use is substantially similar to the use which existed at the time of adoption of the zoning ordinance, or whether there has been an illegal extension of the use. If the present use is substantially similar to the use at the time it became nonconforming, it will be permitted to continue. Arkam Mach. & Tool Co. v. Lyndhurst Tp., 73 N.J.Super. 528, 532, 180 A.2d 348 (App.Div.1962). On the other hand, if there has been an illegal extension of use, a variance must be obtained. Weber v. Pieretti, 77 N.J.Super. 423, 186 A.2d 702 (App.Div.1962), certif. denied, 39 N.J. 236, 188 A.2d 177 (1963). See also Cox, supra, Ch. 11-5 at 261.
Two cases are particularly instructive in evaluating the question of whether the present restaurant operation is substantially similar to the restaurant operation in 1975, the date the use became nonconforming. In Belleville, the Court affirmed a board decision that the change from a restaurant to a "discotheque" was an impermissible extension of a nonconforming use. The Court found that as a restaurant it had been open every day but was now open one day and three evenings. Dancing had been incidental to dining during its operation as a restaurant; as a dancehall, dancing was the primary use. Before, any *903 music was supplied by live musicians; as a dancehall, recorded music was used. As a dancehall, patrons paid an admission charge and the service of food was almost wholly eliminated. 83 N.J. at 317-18, 416 A.2d 388. The Court concluded the change was impermissible because
The entire character of the business has been altered. What was once a restaurant is now a dancehall. Measured by the zoning ordinance the general welfare of the neighborhood has been demonstrably affected adversely by the conversion of defendant's business.
[Id. at 318, 416 A.2d 388.]
In Hantman v. Township of Randolph, 58 N.J.Super. 127, 155 A.2d 554 (App.Div. 1959), certif. denied, 31 N.J. 550, 158 A.2d 451 (1960), the court considered the conversion of a summer bungalow community to a year-round residential community. We stated that an increase in the volume of business alone is ordinarily not considered an expansion of a nonconforming use. Id. at 136, 155 A.2d 554. On the other hand, an increase in the time period during which a nonconforming use is operated may be an unlawful extension of the nonconformity. Id. at 137, 155 A.2d 554. Addressing the specific conversion, we found that the conversion of a seasonal camp-site to a year-round use fundamentally altered and disrupted the Township's general plan for year-round residential uses and held that such conversion was a substantial and unlawful extension of a nonconforming use. Id. at 137-38, 155 A.2d 554. See also Shire Inn, Inc. v. Borough of Avon-by-the-Sea, 321 N.J.Super. 462, 468-69, 729 A.2d 473 (App.Div.) (conversion of nonconforming hotel with twenty-four rooms and one two-bedroom apartment into a Class A rooming house with twenty-six units characterized as a material modification of nonconforming use which frustrated the reasonable expectations of the municipality and the neighbors of eventual abatement), certif. denied, 162 N.J. 132, 741 A.2d 99 (1999).
Measured by this standard, the present operation of the restaurant is not substantially similar to the food service provided by the Atlantic Hotel in 1975. In 1975, the hotel operator provided meals solely to the occupants of the ten rooms. The rooms were occupied only during the summer season which traditionally ran from Memorial Day to Labor Day. Now, the restaurant seats 96 patrons. It is open to the public year round. It is open for breakfast, lunch and dinner. The restaurant now closes at 11 p.m. The food service has changed from only ą la carte service to include banquets. Indeed, the record reveals that banquets account for more than 50% of the restaurant's business. Entertainment is provided for weddings and other special events. This change cannot be characterized as a simple increase in volume. To the contrary, the record demonstrates that the meal service has progressed from a food service operation, not very different from a bed and breakfast, to a full service restaurant.
Furthermore, there has been an intensification of the nonconformity since Bonaventure assumed ownership of the restaurant. Prior to 1992, the restaurant was not used for banquets or other catered affairs. The music offered at the restaurant changed from a background pianist to pre-recorded or live dance music. The restaurant's hours were extended to include breakfast, including service club breakfasts at 7 a.m., and it now closes at 11 p.m. rather than between 9:30 and 10 p.m. Off-premises catering is conducted from the site and there is no on-site parking for patrons or delivery vehicles.
In focusing on the expansion of a nonconforming use, the court must consider the quality, character and intensity of the expansion and its impact on the neighborhood.
*904 Here, the neighbors' testimony included references to the lack of available parking due to special events, difficult traffic patterns caused by the delivery trucks, and an overall nuisance due to the extended hours of the restaurant and its use by its patrons. Judge McGann's analysis of this mixed question of law and fact focused on the critical elements and is fully supported by the record and the governing law.
Having found that the restaurant had impermissibly expanded from its status in 1975, Judge McGann considered whether the Planning Board was estopped from enforcing its zoning ordinance. He concluded that the Planning Board was barred by the principle of equitable estoppel from requiring Bonaventure to seek a variance to operate a 96-seat restaurant. He found, however, that Bonaventure's expansion and intensification of the use through introduction of off-premises catering and on-premises catering for weddings, showers and other special occasions was not protected.
Equitable estoppel has been explained as follows:
"The essential principle of the policy of estoppel ... is that one may, by voluntary conduct, be precluded from taking a course of action that would work injustice and wrong to one who with good reason and in good faith has relied upon such conduct. An estoppel... may arise by silence or omission where one is under a duty to speak or act. It has to do with the inducement of conduct to action or nonaction. One's act or acceptance may close his mouth to allege or prove the truth. The doing or forbearing to do an act induced by the conduct of another may work an estoppel to avoid wrong or injury ensuing from reasonable reliance upon such conduct. The repudiation of one's act done or position assumed is not permissible where that course would work injustice to another who, having the right to do so, has relied thereon."
[Fraternal Order of Police v. Board of Trustees of Police and Firemen's Retirement System, 340 N.J.Super. 473, 484-85, 774 A.2d 680 (App.Div.2001) (quoting Summer Cottagers' Ass'n of Cape May v. City of Cape May, 19 N.J. 493, 503-04, 117 A.2d 585, (1955) (citations omitted)).]
Equitable estoppel is applied "only in very compelling circumstances," Township of Fairfield v. Likanchuk's, Inc., 274 N.J.Super. 320, 331, 644 A.2d 120 (App.Div.1994) (citations omitted), and the burden of proving a claim of equitable estoppel is on the plaintiff. Palatine I, supra, 133 N.J. at 562, 628 A.2d 321. "[T]he ultimate objective [is] fairness to both the public and the individual property owner and ... it [is] necessary to strike a proper balance between the interests of the plaintiff and the right and duty of the municipality to promote the public welfare of the community through proper planning and zoning." Gruber v. Mayor of Raritan Tp., 39 N.J. 1, 15,186 A.2d 489 (1962).
Equitable principles of estoppel may be applied against a municipality "where the interests of justice, morality and common fairness clearly dictate that course." Ranchlands Inc. v. Township of Stafford, 305 N.J.Super. 528, 538, 702 A.2d 1325 (App.Div.1997), aff'd, 156 N.J. 443, 720 A.2d 339 (1998) (quoting Gruber, supra, 39 N.J. at 13, 186 A.2d 489, (1962)); see also Summer Cottagers' Ass'n, supra, 19 N.J. at 504, 117 A.2d 585; Vogt v. Borough of Belmar, 14 N.J. 195, 205, 101 A.2d 849 (1954). However, the doctrine is "rarely invoked against a governmental entity, particularly when estoppel would interfere with essential governmental functions." Ranchlands, supra, 305 N.J.Super. at 538, 702 A.2d 1325 (quoting O'Malley *905 v. Dep't of Energy, 109 N.J. 309, 316, 537A.2d 647 (1987)).
When plaintiff bought the property in 1991, they purchased a successful restaurant which had been open to the public since 1982 and which had a documented seating capacity of 96 since 1987. Judge McGann found there was nothing about its situation that would have given Bonaventure any cause for concern that a use variance was required.[4]
Furthermore, through the years the Planning Board and the Borough had many opportunities to question the slow but steady expansion of the restaurant. When the restaurant first opened to the public, the zoning officer was questioned about the use. Between 1982 and 1988, the operator of the restaurant applied for a retail license to operate the steadily expanding restaurant. In 1986, the operator of the restaurant obtained a building permit to renovate the kitchen. The Board of Adjustment was presented with several applications between 1987 and 1994 at which time no examination of the status of the use was undertaken. Rather the Board of Adjustment started its analysis in each instance with the assumption that the restaurant was a nonconforming 96-seat restaurant.
On the other hand, when Bonaventure acquired the restaurant in late 1991, it did not acquire a restaurant that offered offpremises catering or a restaurant that served as a banquet hall. It also acquired a restaurant that had no on-premises parking for patrons or deliveries. As to the off-premises catering and the on-premises banquet business, Bonaventure has not established a compelling reason to justify the invocation of the doctrine.
Bonaventure and the Planning Board argue that Judge McGann's consideration of the use during Bonaventure's ownership and operation goes beyond the record compiled by the Planning Board and constitutes the substitution of his judgment for that of the Planning Board. We disagree.
We have previously detailed the differences in the operation from the restaurant's initial opening to the public in 1982 through its operation by KTI and Bonaventure. Judge McGann's findings of intensification since 1992 are well-supported in the record compiled before the Planning Board. Moreover, the issue of expansion is a question of mixed law and fact. Belleville, supra, 83 N.J. at 317, 416 A.2d 388. The trial judge owes no deference to the legal conclusions of the board. Manalapan Realty, L.P. v. Township Comm., 140 N.J. 366, 378, 658 A.2d 1230 (1995). In the course of examining the issue of expansion or intensification of a nonconforming use, the trial judge was obliged not only to determine the nature of the use in 1975, but also to examine the steady course of expansion over the years. It was particularly critical to examine the nature of the use throughout the years when the owner urged the application of the infrequently invoked doctrine of equitable estoppel. Thus, we affirm Judge McGann's order that Bonaventure must apply for a variance to conduct anything other than a 96-seat ą la carte restaurant.
In the course of his examination of the expansion of the use, Judge McGann identified five activities on the site which have been recently introduced and do not warrant protection through the application of equitable estoppel. Therefore, pending the owner's application for a use variance, Judge McGann has prohibited off-premises *906 catering, on-premises catering of private parties, live or recorded loud music, dancing, and special events. The Borough informed us at oral argument that the onpremises catering/banquet and special event prohibitions have posed significant enforcement problems.
We appreciate the difficulty imposed by the banquet and special event prohibitions. Clearly the on-premises catering or banquet prohibition was designed to encompass those instances when all or a substantial portion of the restaurant is booked for a single event, such as a wedding, anniversary party, baby or bridal shower or christening. Based on the record, the special event prohibition seems to encompass the service club breakfasts and other events in which less than the entire premises are used for a specific group of people. The record is replete with testimony that gatherings of more than twenty persons have a negative impact on the neighborhood attributable to the traffic and noise normally associated with people congregating in one spot at one time. Understandably, however, the municipal authorities are left with no guidelines for enforcing the on-premises catering/banquet and special event prohibitions. We recognize that the demarcation between a party and a large table at an ą la carte restaurant may defy precise definition. Nevertheless, in view of Judge McGann's eminently correct legal determination that Bonaventure may only operate a 96-seat ą la carte restaurant, we modify the prohibitions regarding on-premises catering/banquets and special events to provide that The Sandpiper may not cater private parties on premises such as engagement parties, weddings, rehearsal dinners, bridal and baby showers, anniversary parties, and the like, and may not accept a reservation for a group of more than 20 persons. All other prohibitions remain in effect until Bonaventure obtains a use variance.

IV
Finally, we consider Bonaventure's contention that Judge D'Amico erred when he rejected the arguments that defendants' appeal of the zoning officer's decision was untimely and that their appeal was barred by the entire controversy doctrine and res judicata. We affirm each of these rulings.
The zoning officer ruled on July 9, 1997, that the restaurant was a valid nonconforming use. Defendants filed their appeal from this opinion within twenty days as required by N.J.S.A. 40:55D-72(a). Therefore, their appeal was timely.
Bonaventure also argued that defendants were barred from litigating the issue of the restaurant's nonconforming status due to the multiple times it or a prior owner had filed applications before the Planning Board and the opportunity each neighbor had to challenge the status of the restaurant.
The entire controversy doctrine is an equitable preclusionary doctrine. Its purpose is to encourage comprehensive and conclusive determinations, to avoid fragmentation and to promote party fairness and judicial economy. See generally, Falcone v. Middlesex County Med. Soc., 47 N.J. 92, 219 A.2d 505 (1966). The doctrine does not apply to bar component claims either unknown, unarisen, or unaccrued at the time of the original action. Harley Davidson Motor Co. v. Advance Die Casting, Inc., 150 N.J. 489, 494, 696 A.2d 666 (1997). Here, defendants did not learn the facts concerning the history of the restaurant until a planner retained by them to oppose the liquor license transfer unearthed information about the use of the building at the time the zoning ordinance was amended and the hotel and the restaurant became nonconforming uses. Furthermore, the issues before the Board of Adjustment in 1987 and 1994 were limited *907 to applications for specific relief which did not include consideration of the number of seats.
Similarly, res judicata did not bar the current application. The Planning Board never resolved any contest regarding the status of the hotel and restaurant. Each application concerned an attempt by the owner to add a feature to the structure or restaurant. The prior applications lacked the commonality of subject matter, commonality of parties and a disposition on the merits of the status of the restaurant as a nonconforming use to warrant invocation of the doctrine. Bressman v. Gash, 131 N.J. 517, 526-27, 621 A.2d 476 (1993); Charlie Brown of Chatham, Inc. v. Board of Adjustment of Chatham, 202 N.J.Super. 312, 327, 495 A.2d 119 (App.Div.1985).
Affirmed as modified.
NOTES
[1] Appellants/respondents Brennan, Kappy, Nazarian, Raia and Saboy's motion to consolidate is granted.
[2] Since 1996 the Planning Board of Spring Lake and the Spring Lake Board of Adjustment are a unified board. N.J.S.A. 40:55D-25c.
[3] Although the Brennans, Kappys, Nazarians, Raias and Saboys are plaintiffs in a separate prerogative writ action, we have consolidated both appeals. We refer to them as defendants, referencing their party status in the first-filed appeal.
[4] None of the former or present operators of the restaurant ever applied for a certification that the use existed before adoption of the 1975 zoning ordinance, as allowed by N.J.S.A. 40:55D-68.