88 N.J. Super. 91 (1965)
210 A.2d 794
BOARD OF EDUCATION OF THE VOCATIONAL SCHOOL OF THE COUNTY OF UNION, A BOARD OF EDUCATION, PLAINTIFF,
v.
FINNE, LYMAN AND FINNE, A PARTNERSHIP, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided May 27, 1965.
*93 Mr. Jeremiah D. O'Dwyer for plaintiff (Messrs. Dughi & Johnstone, attorneys).
Mr. H. Russell Morss, Jr. for defendant (Messrs. O'Connor, Morss & O'Connor, attorneys).
FELLER, J.S.C.
This is an action filed by plaintiff Board of Education of the Vocational School of the County of Union for a declaratory judgment pursuant to R.R. 4:92A in the form of a summary judgment pursuant to R.R. 4:58-1. The action seeks to determine the validity of an agreement signed on August 12, 1960 between the 1960 board of education and defendant architectural firm. Plaintiff board is created under R.S. 18:15-39 and N.J.S.A. 18:15-58.8, and conducts a vocational school in and for Union County. It was established in 1959. R.S. 18:15-39 provides:
"When it has been determined by resolution of the state board of education that a need exists in any county for county industrial, agricultural or household arts schools, the state board of education *94 shall transmit a copy of the resolution to the board of chosen freeholders of the county. Upon receiving the copy, the board of chosen freeholders shall vote on the question whether such schools shall be established in the county in accordance with the recommendation. If the board of freeholders by a majority vote favors the establishment of such schools in the county, such schools shall be forthwith established and maintained in the county and shall be known as the `vocational schools in the county of ____' (here insert the name of the county in which the schools are located)."
N.J.S.A. 18:15-58.8 provides:
"For such county vocational school established in accordance with this act there shall be a board of education consisting of the county superintendent of schools and four persons to be appointed by the director of the Board of Chosen Freeholders, with the advice and consent of such board. Not more than two appointed members shall be members of the same political parties, but no changes for adjustment of party representation shall be made in the board, except as vacancies occur. In making the first appointments to a board, one person shall be appointed to serve for one year, one for two years, one for three years, and one for four years, from November 1st next succeeding the date of their respective appointments. Persons so appointed shall also serve from the date of their respective appointments until November 1st, next ensuing. Thereafter annually, during the month of October, a member of the board shall be appointed to serve for a term of four years to take the place of the member whose term shall expire on November 1st, then next ensuing.
Vacancies in the board caused by the death, resignation or removal of a member shall be reported forthwith by the secretary of the board to the director of the Board of Chosen Freeholders, who, within thirty days thereafter and in the manner herein prescribed for making appointments for a full term, shall appoint a person to fill the vacancy for the unexpired term."
The board derives it power or authority from N.J.S.A. 18:15-51. Defendant is a New Jersey partnership with its principal office at 1155 Magnolia Avenue, Elizabeth, New Jersey.
In May 1960 defendant firm was selected as the architect by the board of education. On August 12, 1960 an agreement was entered into between the two parties. This agreement provided that for a stated valuable consideration defendant firm was to provide complete architectural services for a proposed school which the board intended to erect on a site to be *95 selected in the future in Union County. Presently, the school facilities directed by the board are conducted in rented premises in Scotch Plains and Mountainside. Pursuant to N.J.S.A. 18:15-46 and 18:15-58.8 the board is composed of five members, four of whom are appointed by the director of the board of chosen freeholders of the county with the advice and consent of that board; the fifth member, the county superintendent of schools, is a permanent member.
N.J.S.A. 18:15-46 and 18:15-58.8 provide that once a vocational school board has been created, the terms of the members, with the exception of the superintendent of schools, the permanent member, shall be staggered; one member is appointed for one year, one for two years, one for three years, and one for four years. Thereafter, the term of each member shall be four years. Thus, the term of one member expires each year and a new member must be appointed.
The agreement of August 12, 1960 was signed by the following five members of the board: President Coffrey, Mrs. Redden, Mr. Weber, Mr. Volosin and Dr. William H. West, the county superintendent of schools. With the exception of Dr. West, none of the four mentioned members is a member of the board today, or was at the time the board filed its complaint.
Prior to May 1960 the then board of education interviewed nine different architects or architectural firms, and on May 31, 1960 by resolution authorized the proper board officers to enter into a contract with defendant firm. The minutes of the May 31, 1960 meeting indicate that the board interviewed nine different architectural firms. The minutes then say:
"Mr. Weber moved that the architectural firm of Finne, Lyman, and Finne be appointed to work with the Director and the Board in preparing plans and specifications for our first school, in accordance with the fees as stipulated in the firm's letter of May 27, 1960. Seconded by Mr. Volosin. Mr. Volosin stated that he seconded the motion because he was highly impressed with the work of this firm on the Junior High School building in Iselin and the elementary school known as Deerfield in Linden. Mr. Weber commented that he knew of the firm's good work in industry and, therefore, had confidence *96 in their ability to handle this assignment. Mr. Caffrey commented that he had made personal investigation of the firm and found that both the Superintendent of Schools in Linden and Woodbridge and the general contractors on the respective jobs were well satisfied with this firm and its work. * * * The President called for a roll call vote which resulted in `ayes' by Messrs. Caffrey, Volosin, and Weber, and a `nay' by West. Motion carried."
In order to obtain funds for its operations, both current and capital, the board must initially apply to the board of school estimate pursuant to N.J.S.A. 18:15-55, 56. In the case of moneys required for a current school year the board prepares an estimate of needs and submits it to the board of school estimate. N.J.S.A. 18:15-55. The latter then certifies the amount to be appropriated and delivers its certificate to the board of freeholders, whereupon the freeholders "shall, upon receipt of the certificate, appropriate, in the same manner as other appropriations are made by it, the amount so certified * * *." N.J.S.A. 18:15-56. Where a board of education of a county vocational school seeks capital funds, the procedure is the same, with the exception that the statute provides that the freeholders "may" appropriate funds, rather than "shall" appropriate funds, as in the case of current expenses. N.J.S.A. 18:15-57 and 18:15-58.13.
In August 1960, when the contract in question was executed, no funds had been made available by the board of freeholders for a capital expansion program. At its November 15, 1960 meeting the board deemed it advisable to have defendant firm prepare a cost study preliminary to the institution of a land acquisition program. The first application made by the board to the board of school estimate for certification of the amount necessary for the construction of the proposed vocational school was on December 21, 1960. The board requested $3,889,400, and the board of school estimate on the same day approved this sum and forwarded its certification to the board of freeholders. On July 7, 1961 the freeholders denied the request for the capital expansion program. On October 3, 1961 the then board of education passed a resolution requesting $675,000 for the acquisition of two *97 pieces of real property within the county for the development of one school in the near future on one site, and the second site for future development of a school, and submitted this request to the board of school estimate. This request was the result of a report made to plaintiff board by defendant firm concerning an examination of various plots referred to the firm by Director Baxel of the Union County Vocational School. On November 21, 1961 the board of school estimate reduced the amount, approved $250,000 for the acquisition of one site in Scotch Plains fronting on Raritan Road, known as the McCollum tract, and authorized the board to proceed to acquire title to the said McCollum tract in Scotch Plains, which it did on May 10, 1962. The tract had an area of from 38 to 43 acres.
The question of engaging the services of educational consultants, whose fees were to be deducted from those of defendant firm, was reopened at the board meeting of April 9, 1962. At the same meeting it was decided to close the land investigation which had been initiated two years previously, and the possibilities for utilization of the structure on the McCollum tract were also discussed.
At its June 11, 1962 meeting the board agreed to request authority from the board of freeholders to use the surplus that was realized from the funds allocated for land acquisition for the employment of an educational consultant pursuant to the August 12, 1960 agreement, to aid the defendant firm in rendering its services.
On June 25, 1962 defendant firm received a letter from Director Baxel complimenting the firm for its "rendering and sketch" and informing it that the board had "requested release of some service money from the Freeholders but have not received a reply as yet."
On October 15, 1962 the board passed a resolution requesting approval to expend $18,000 from the unexpended money authorized for the land acquisition in order to "have a sketch and drawings prepared by the Board's architect for use by the members of the Board of School Estimate in considering the *98 resolution, providing the Board is able to contract for such special services with the architect * * *." The relevant portions of the minutes of the October 15, 1962 meeting are:
"The purpose of this meeting was to consider and act upon resolutions requesting funds for building and furnishing a school. The Secretary read two resolutions that had been prepared in advance. After some discussion Mr. Simmons moved the following resolution requesting funds in the land account be made available for preliminary drawings, etc. as stated in the resolution below: seconded by Mr. Volosin:
`Whereas the Board of Education of the Vocational School in the County of Union has on October 15, 1962, adopted a resolution on the need for funds for the purpose of erecting buildings for school purposes, and the purchase and installation of furnishings and equipment therein, on land owned in Scotch Plains, and
Whereas, the Board recognizes that because of the date of this action it will be impractical to expect the Board of Estimate to give proper consideration to the resolution within the next few weeks, during which time it will be possible to have a sketch and drawings prepared by the Board's architect for use by the members of the Board of School Estimate in considering the resolution, provided the Board is able to contract for such special services with the architect; now therefore,
Be it resolved by the Board of Education of the Vocational School in the County of Union as follows:
Section 1. The Board of Education hereby decides that it is necessary to request permission to use from the balance of funds in the account for the purchase of land, a sum not to exceed $18,000 for the hiring of special consultant and architectural services to prepare preliminary plans and sketches to show what is intended to be procured with the funds requested in the previous resolution. * * *'" (Emphasis added)
At the same meeting the board again certified its need for capital funds to the board of school estimate and recognized in the above resolution that it had an architect.
On December 17, 1962 the board of school estimate declined either to approve the $18,000 expenditure or to certify the request for the capital funds to the board of freeholders.
On September 9, 1963 the board again requested $3,750,000 for the capital expansion program, but the board of school estimate took no action on the request and no funds were appropriated. The minutes of this meeting indicate that site *99 cleaning activities on the McCollum tract were proceeding, a contract having been awarded for filling the old cellar excavation and cleaning up the residue of the concrete barn floor.
In September 1964 the board of freeholders notified plaintiff board that it wanted the matter of the appropriation of moneys for a capital expansion program to be placed on the ballot as a non-binding referendum at the general election to be held in November 1964. Prior to this election plaintiff board requested defendant firm to prepare graphic presentations and cost studies for the board's use in orienting the citizens of Union County with reference to the board's program before they voted on the public question relative to the proposed $3,750,000 capital fund appropriation. These data were used for dissemination to public news media and for distribution of brochures to the voters. At that election a majority of the voters indicated approval of an expenditure of $3,750,000 for the erection of a county vocational school. On November 16, 1964 the board again prepared an estimate of moneys required for the capital expansion program and submitted a request to the board of school estimate for $3,750,000. The latter board certified this amount on December 2, 1964 and transmitted its certificate to the board of freeholders. On the same day the board of school estimate approved the expenditure of $17,505 for preliminary architectural work.
On December 17, 1964 the freeholders passed a resolution wherein they expressed their approval for such an expenditure of moneys.
Prior to the general election, but after defendant firm had been requested to and did supply graphic presentations and cost studies for plaintiff board's use in educating the voters, the board, by letter dated November 2, 1964 and after a vote of all board members, notified defendant firm that the board did not consider itself bound by the August 12, 1960 agreement and that it intended to interview and assess the qualifications of other architects, including defendant firm, in connection with any future building plans. The letter also requested the firm to submit to the board a bill for any preliminary *100 services rendered. It was this letter that first announced the board's intention to repudiate its contract with the firm. It is interesting to note that the only remaining member of the board that existed when the firm was originally retained, and the sole member of that original board to vote against employing defendant firm  Secretary West  voted against terminating the services of the firm after voicing an objection "on the grounds that the job of planning and building a school should not be held up now because of the desires of some members to consider other architects."
Plaintiff board admits that defendant performed many services since August 12, 1960.
In a letter dated December 2, 1964 defendant firm, through its counsel, asserted that it regarded the August 12, 1960 agreement as a "legal, binding agreement." Plaintiff board asserts that the agreement is not a valid contract. Thus, a justiciable controversy is presented.
The board filed this action on December 11, 1964, seeking a declaratory judgment to determine whether the August 1960 agreement will compel it to utilize the services of defendant firm in the evolution of the future building program. The firm was served with a summons and complaint on December 15, 1964. It filed an answer on January 20, 1965. The board sought summary judgment on February 10, 1965; the firm, in turn, asks for summary judgment.
There is a large discrepancy in the affidavits submitted to the court in support of the cross-motions for summary judgment concerning the services rendered by the firm. The firm contends that its efforts were far in excess of those admitted to by the board. The court does not find it necessary to examine the relative contentions raised by the parties concerning the actual services performed by the firm in the determination of the cross-motions because of the position it takes, as set out at length in the following paragraphs. Moreover, the factual question as to what services the firm rendered will not prevent the determination of the cross-motions because those motions are directed to the validity of the 1960 agreement. The issue *101 of the validity of the agreement is the primary one. If this court determines that the contract is valid, then the question of services rendered becomes moot since the terms for compensation under the agreement would govern. If, on the other hand, the court determines that the agreement is not a valid contract, then the issue of compensation may be raised in an independent action. The court will therefore concern itself with the main issue and not with the subordinate one concerning compensation where, admittedly, there is a factual dispute.
Plaintiff argues that the agreement entered into by the 1960 board cannot bind the present board, and that the contract may not be valid on the theory of ratification, estoppel or laches. Plaintiff contends that to compel it to be bound by the 1960 agreement would deprive the members of the board of their full right to exercise their discretion and judgment in the selection of those persons who will be called upon to render service to the board and the county. However, on the basis of quantum meruit, the board indicates a willingness to compensate defendant firm for services it rendered up to the present time.
The firm argues that the agreement of August 12, 1960 is valid and that in relying on it for a period in excess of four years the firm has rendered services for which it has not been compensated. It contends that no charge of incompetency or dissatisfaction has been made against it; that plaintiff board lacks good faith in instituting this action; that the court is without jurisdiction to hear the matter since other remedies are available to the board, and that the board is guilty of laches.
The firm by way of counterclaim contends that it has performed all work up to date entitling it to a sum equal to 25% of the fee computed upon a reasonable estimated cost of the work, as provided by article 2, paragraph (b), subparagraph (1) of the 1960 contract. This sum is somewhat in excess of $28,000. It further contends that no part of its fee has been paid; that it is entitled to the reasonable value of its services, *102 and that if the board prevails, the firm will suffer not only loss of expected fees, but also damage to its reputation.
The board argues that either the expiration of the term of office of the 1960 board of education or the failure of the board of freeholders at any time to appropriate capital funds for the construction of the proposed vocational school is enough to invalidate the 1960 agreement.
Initially, plaintiff says:
"With respect to the power of a municipal governing body or other public agency to bind its successors, a distinction is drawn between governmental and proprietary actions of such bodies. If a municipal body or public board is acting in the discharge of a governmental function or power they may not act so as to tie the hands of their successors. If, on the other hand, they are operating within the proprietary sphere such action may be taken provided it is reasonable under the circumstances and not contrary to the public interest."
While the above generalization is true, yet there are exceptions. 10 McQuillin, Municipal Corporations (3d ed. 1950), § 29.101, pp. 408-409, says:
"Respecting the binding effect of contracts extending beyond the term of officers acting for the municipality, there exists a clear distinction in the judicial decisions between governmental and business or proprietary powers. With respect to the former, their exercise is so limited that no action taken by the governmental body is binding upon its successors, whereas the latter is not subject to such limitation, and may be exercised in a way that will be binding upon the municipality after the board exercising the power shall have ceased to exist. Consequently, although a contrary rule prevails as to contracts relating to business affairs, it is generally held that, independent of statute or charter provisions, the hands of successors cannot be tied by contracts relating to legislative functions."
There does not appear to be any dispute that the conduct of educational activities is a governmental activity as opposed to a proprietary venture. 18 McQuillin, op. cit., § 53.30, pp. 196-197. See Skladzien v. Board of Education of Bayonne, 12 N.J. Misc. 602, 173 A. 600 (Sup. Ct. 1934), affirmed 115 N.J.L. 203 (E. & A. 1935), where the facts relating to board composition were different but where the court said:
*103 "A new board comes into being each year, since, as here, the term of three members expires each year, and, whether new persons are appointed to complete the board or the personnel remains the same, in fact and in law it is a new board of education. Such board is not therefore a continuous body for that reason. It has all the indicia of non-continuous bodies. It organizes in February of each year, adopts rules for its own administration each year, is completed each year by the selection of three new members in the place and stead of those three whose terms have expired." (at p. 604)
Clearly, plaintiff maintains four of its members each year while only one is added. But this distinction is not paramount herein because of another pertinent part of section 29.101 of McQuillin, op cit., supra, in which the author states that although the decisions are not entirely harmonious, the general rule seems to be that a contract of employment extending beyond the term of the office of the members of a public board, such as a board of county commissioners, a municipal board, or other like controlling body representing a municipal corporation, is, if made in good faith, ordinarily a valid contract. So it has been held that architects may be employed to prepare plans and specifications and to supervise the work, until its completion, although the building may not be completed until after the tenure of office of the official board.
Plaintiff board relies on Valvano v. Board of Chosen Freeholders of Union County, 75 N.J. Super. 448 (App. Div. 1962), wherein, because of a political reversal, the board of freeholders entered into an emergency "eleventh-hour employment contract on the eve of a new administration" with an insurance broker for the sole purpose of solidifying in office a subordinate appointee of the old board for three years beyond his current term, thus depriving the incoming governing body of its right to obtain independent professional consultation and advice of its own choosing. The contract in Valvano provided that:
"* * * the plaintiff was to act as sole and exclusive broker for the county `for the purposes of procuring any and all insurance that may be necessary to protect the interests of the COUNTY OF UNION *104 and to supervise all such insurance and COUNTY indemnity bonds,' and that the broker was to hold himself available for consultation and conferences with the entire board or any of its appointed committees relating to insurance matters." (Emphasis added)
The above contract was to render "all" services relating to insurance and was not directed to any one project. The contract in the case sub judice was for a single project and not for all projects into which plaintiff might enter. Consequently, it could hire another architect to counsel with it on any or all other matters needing such attention. See 149 A.L.R. 336, 342, which reports as follows:
"Where the contract for services is not for services to be rendered during a particular period, but for the doing of a particular and specified act the performance of which may extend beyond the term of the officers making it, the majority rule does not apply. Thus in Pima County v. Grossetta, 54 Ariz. 530, 97 P.2d 538 (1939), the county board of supervisors employed special counsel to handle legal matters in which the county was interested, the performance of the contract extending beyond the term of the existing board and that of the county attorney who consented thereto. In holding the contract valid, the court said: `Where the contract in question is a unitary one for the doing of a particular and specified act, but its performance may extend beyond the term of the officers making it, if it appears that the contract was made in good faith and in the public interest, it is not void because it will not be completed during the term of those officers. If, on the other hand, the contract is for the performance of personal or professional services for the employing officers, their successors must be allowed to choose for themselves those persons on whose honesty, skill, and ability they must rely. The contracts in question were not for the employment of the various attorneys as general advisors to the board of supervisors, but were unitary contracts to handle certain specified matters for a fixed compensation, and not on a time basis. We think, therefore, they fall within the class of contracts which may extend beyond the time of the contracting officers.'" (Emphasis added)
The court in Valvano was concerned with the particular facts therein involved; still, it said:
"While the common law governmental-proprietary dichotomy is a salutary guide leading to the correct conclusion in the instant case, we should note that it is not an inexorable rule for vigorous adherence. It is a legal principle universally recognized, but not uniformly applied. * * * [Citations omitted] The distinction between governmental *105 and proprietary functions is not easy to decipher. * * * [Citations omitted] As the scope of `governmentality' expands, the intertwining and overlapping of such functions make it increasingly more difficult to draw any definitive line of separation." (75 N.J. Super., at p. 451)
The court concluded by saying that "The facts revealed by the record do not sustain the purity of motivation, good faith and quid pro quo which are essential to the validity of a municipal contract."
Therefore, it is evident that there is a distinction drawn between governmental and proprietary activities of public bodies. If the body performs a governmental function, then it may not tie the hands of its successor; however, there is an exception to this general rule concerning employment contracts made in good faith, an example being the employment of an architect for preliminary plans and supervision to completion of a project.
Withers v. City of New York, 92 App. Div. 147, 86 N.Y.S. 1105 (App. Div. 1904), established the general rule that where an architect is employed by a municipal board, his term of service may exceed that of the board:
"But it is claimed that, where authority is given to a municipality or official board to contract, without any specification of the term, the municipality or board can contract only for a reasonable period, to be determined usually by the tenure of office of the official board. We do not think that the rule sought to be invoked has any application to the case at bar. Here was a municipal building to be erected. The necessity for the appointment of architects for the purpose of preparing plans and specifications and supervising the work is recognized by the statute. The employment was one having a specific object, and would necessarily terminate upon the completion of the buildings which were to be erected under the authority of the statute. There is no reason why a contract of employment in reference to this specific work until its completion should not be entered into, any more than any other contract in connection with any public building, the erection of which is liable to extend beyond the term of office of the individual members of the board authorized to make the contract." (86 N.Y.S., at pp. 1107-1108)
In other words, where architects are employed to prepare plans and specifications and supervise the work and construction *106 of a public building without any agreement as to the length of their service, the term of their employment should be regarded as terminating on the completion of the building. There is no reason why a contract of employment in reference to the specific work of constructing a public building should not be entered into although the erection of said building is liable to extend beyond the term of office of the individual members of the board authorized to make the contract.
The court in Withers recognized that the statute expressly provided for the appointment of architects to prepare plans and supervise the work. This same power is vested in plaintiff board by implication under N.J.S.A. 18:15-51 ("Powers of board"):
"The board of education of a county vocational school district may:
Purchase, sell, and improve school grounds, erect * * * school buildings * * *." (Emphasis added)
Clearly, a board could not erect school buildings without the aid of architects. There is no provision granting plaintiff express authority to hire architects, but the statute must be interpreted reasonably so as to support the intent of the Legislature. City of Clifton v. Passaic County Board of Taxation, 28 N.J. 411, 421 (1958).
On the basis of the Withers case, supra, and section 29.101 of McQuillin, supra, at page 413, together with the distinguishing factors above indicated in the Valvano case, this court feels that the 1960 board had the power to contract with defendant firm and so bind the present board, even though it is probably engaged in a governmental and not a proprietary operation.
Plaintiff cites the test in Whitworth College v. City of Brookhaven, 161 F. Supp. 775 (D. Ct. S.D. Miss. 1958), affirmed 261 F.2d 868 (5 Cir. 1958), as controlling the case at bar:
"The true test is whether the contract in question deprives the governing body or its members of a discretion which public policy requires should be left to succeeding public bodies." *107 However, the Whitworth case involved a lease and an option to renew said lease; it did not involve an employment contract to do specific work until its completion and was clearly violative of the statutory enactment allowing leases but not options to renew.
Should the view taken by plaintiff board prevail in this case, then all contracts of this nature would terminate upon the conclusion of a current term of office of a public board or body. In the case of the board, it would appear that architects or other professional persons rendering like services would have to complete their tasks within one year. They would have to be interviewed, screened and selected, their contracts would have to be drawn and executed, and their services, including preliminary cost studies, renderings, preliminary plans, detailed plans, and work drawings, as well as their supervision of actual construction, would have to be completed between November 1 of one year and November 1 of the succeeding year, since the term of at least one board member expires annually. N.J.S.A. 18:15-46. Such a result would be not only costly and impractical, but also illogical. Statutes will not be construed to lead to absurd consequences and must be read sensibly. Schierstead v. City of Brigantine, 29 N.J. 220, 230-231 (1959).
Plaintiff argues that it cannot be bound by a contract made by the 1960 board when that body had not been empowered by way of a capital appropriation to undertake construction of the proposed school. The distinction between a "planning phase" and a "construction phase" with respect to architectural services is cited by plaintiff as having been recognized in Sleight v. Board of Education of Paterson, 112 N.J.L. 422 (E. & A. 1933). That case was an appeal from a judgment which struck the plaintiff's complaint as not stating a cause of action. The complaint alleged that plaintiff and his father, as partners, were engaged as architects by the Paterson Board of Education to prepare plans and specifications for a proposed new school building in Paterson; that plaintiff, as assignee of the partnership business, rendered architectural *108 services to the board of education at its request in the form of plans and specifications for the proposed new school; that the board agreed to pay the reasonable worth of the services rendered; that the same were reasonably worth $11,885.22, and that the board paid plaintiff on account the sum of $4,000, leaving due a balance of $7,885.22. The answer admitted the hiring of plaintiff's assignor to prepare plans, but denied that defendant board had any legal authority to engage plaintiff's assignor and alleged that it acted beyond the scope of its power by so doing. The board relied on the fact that it had no authority to enter into any such contract with plaintiff or his assignor because it had "no money appropriated or authorized for such purpose." In reversing the lower courts, the Court of Errors and Appeals found that they had erred in assuming that the allegations by the board in the separate defense, that there were no funds available, were true, and thereby improperly relieved the board of the burden of proving these facts, in addition to depriving plaintiff architect of the opportunity of showing that such funds did in fact exist.
The contract in the Sleight case did not provide for complete architectural services. It was limited to preliminary services antedating a capital appropriation, and the holding of the case is confined to the conclusion that the board of education under the statute then controlling had the implied power to incur reasonable expenses for obtaining such expert information as might be necessary to furnish a basis for an accurate estimate of the cost of the proposed school building; that this justified the engagement by the board of an architect, and that upon the performance of his services the architect could maintain an action on the quantum meruit theory to recover reasonable compensation therefor.
The Sleight case did not concern itself with the question of whether a board of education may contract for services involving the expenditure of capital funds before the appropriation of such funds, even though it did distinguish between "current and capital" accounts or funds. The court (at page 426) felt that under the wording of the statute plaintiff architect *109 should be compensated for his plans and specifications out of the current or operating funds available annually to the board of education:
"We can see no valid reason why a board of education may not compensate an architect from its general funds for drawing plans and specifications for a contemplated school building where such building is not erected."
Plaintiff board in the present case relies on the following language from page 427 of the Sleight case:
"In the system of bookkeeping prescribed by the state board of education under the statutory authority (Pamph. L. 1911, p. 506), the state board of education draws a marked distinction between the plans and specifications for an estimate of a proposed school building which is not constructed, and the plans and specifications where a building is constructed, so far as related to the payment of the architect.
In the first case the state board directs the city board of education to pay the architect out of current expenses (that is `general' fund) and in the second case he is to be paid out of the fund appropriated for such building (that is, `capital' fund) which then includes a sum for his services."
It is the opinion of this court that within the confines of the Sleight case the above language defines the source of payment for different parts of the job to be done by the architect under the General School Law of 1903. However, there is no prohibition in the above language against a contract for both preliminary plans and supervision and completion of work. The only application of the above quotation, if it applied to this, would be a direction that when an architect is paid for services rendered, that part of his compensation for his preliminary plans should come from the board's current funds, while that part of his compensation for other services in connection with construction should come from the board's capital fund.
This court has found no New Jersey precedent which parallels the factual situation in the case under consideration. The question of the legality of contracts involving the expenditure of capital funds where the execution of the contract *110 antedates the appropriation of the capital funds has not as yet been passed upon by a court of this State. Clearly, the Sleight case, supra, cited by plaintiff board never reached this question and is not in point.
City Affairs Committee of Jersey City v. Board of Com'rs of Jersey City, 134 N.J.L. 180 (E. & A. 1946), said in relevant part that:
"* * * It is the general rule that even a contract ultra vires for failure of an appropriation or other act made a condition precedent by statute may be ratified by performance of the condition essential to a valid agreement in the first instance, e.g., the making of the required appropriation. Gutta-Percha & Rubber Mfg. Co. v. Village of Ogalalla, 40 Neb. 775; 59 N.W. 513; 44 C.J. 1146. Of course, a contract wholly and fundamentally beyond the power of the municipality, as distinguished from a corporate power conditioned as to exercise, is utterly void, and therefore incapable of ratification. But it is also a rule of general acceptance (indeed, a modern text writer cites no case contrariwise) that an ultra vires contract made by a municipality which has been fully performed by both parties is no longer assailable by either party. 38 Am. Jur. 183. This principle has been applied to cases where, as here, the municipal corporation is empowered to enter into the particular contract, but the contract is ultra vires in the restricted or secondary sense that the power has been defectively or irregularly exercised, and the municipality has received the benefits of the contract and paid the stipulated price." (at pp. 183-184; citations omitted)
It is evident that the 1960 contract in question was not ultra vires the power of the 1960 board since the agreement covered one specific job. It is also evident that there is no statutory requirement in Title 18, Education, of the New Jersey Revised Statutes necessitating an appropriation of capital funds as a condition precedent to the making of a contract by plaintiff board of education. However, the Jersey City case, above, indicates that even if a contract is ultra vires in the secondary sense for failure of the making of the statutory condition precedent of an appropriation, still, if the appropriation is thereafter made, the contract is deemed to be ratified. In the case at bar there was an appropriation for a capital expenditure for the acquisition of the McCollum tract in Scotch Plains by plaintiff in the sum of $250,000 between the *111 meeting of the board of school estimate of November 21, 1961 and the meeting of plaintiff board on June 11, 1962. Moreover, on December 17, 1964, the Union County freeholders passed a resolution approving the expenditure of $3,750,000 in the form of a capital appropriation for the erection of a vocational school. Since that time, part of the appropriation has been made available and is awaiting use by plaintiff, subject to its desire to proceed. The only obstacle to beginning work is the allegation by the board that it has no architect.
It is of interest to note that Title 18, Education, contains no statute similar to the one contained in Title 40, Municipalities N.J.S.A. 40:50-6 provides as follows:
"No municipality shall enter into any contract, the cost of which is to be met by funds not included in the budget of appropriations for the year, unless prior thereto there shall have been regularly adopted by the governing body an ordinance authorizing an appropriation sufficient to meet the cost of carrying out the provisions of the contract. This section shall not apply to the use of funds of departments, for the operation of which budget appropriations are not made, nor to contracts for professional services for the liquidation or foreclosure of tax title liens in such municipalities wherein it is agreed that the cost of the services are to be paid, in all or in part, from the funds derived, or to be derived from the redemption of liened property or the sale of foreclosed property, subject to approval of the Department of Local Government." (Emphasis added)
In the absence of a provision in Title 18 similar to that contained in Title 40 and quoted above, it must be presumed that the Legislature intended to omit such a provision.
A court should not write in an additional qualification which the Legislature pointedly omitted in drafting its own enactment. Craster v. Board of Commissioners of City of Newark, 9 N.J. 225 (1952). In the construction of a statute, words should never be supplied or changed, unless to do so will effect a meaning clearly shown by the other parts of the statute, or to carry out an intent somewhere expressed. Lane v. Schomp, 20 N.J. Eq. 82 (Ch. 1869).
If the 1960 contract between the parties is void, then plaintiff will have to hire another architect, who will begin to *112 formulate new conceptual designs and plans. The result would be needless duplication of time and effort, as well as needless expense to the public. There is no question that defendant is entitled to payment for services already rendered. To pay it $10,000 or $28,750 (these appear to be the respective claims as to the worth of the work already performed by it) and then to disregard the product of such endeavors and expense and begin anew would involve duplication of effort, loss of time and additional expense. This was not the legislative intent. Therefore, because the employment herein of defendant firm was for a specific job which could not be completed before the expiration of the term of any one board of education; because there is no prohibition in Title 18 as there is, for example, in Title 40 requiring an appropriation before a contract may be made, and because of the dearth of authority in support of plaintiff board's contention, this court is convinced that the 1960 contract is valid.
It is generally recognized, as was said in 405 Monroe Co. v. City of Asbury Park, 40 N.J. 457 (1963), that:
"The law has become increasingly sensitive to the need for business integrity in public transactions as well as in private ones. True it is important to protect the public against official imprudence, but there is also the moral principle that a government which would encourage fair dealing in private transactions should insist upon nothing less of its own agencies. It is one thing to expect officials to know and stay within their power and to call them to account if they willfully exceed it. It is something else to ask all who deal with a municipality to bear the burden of officialdom's ignorance of its own authority." (at pp. 462-463)
The 1960 contract in question is binding. Consequently, the court need not consider the arguments of estoppel, laches and ratification, raised by the defendant firm. However, if such arguments had to be considered, the court would be guided in this case by the 405 Monroe Co. v. City of Asbury Park case, supra. Therein the court said:
"We have heretofore noted `the strong recent trend towards the application of equitable principles of estoppel against public bodies *113 where the interests of justice, morality and common fairness clearly dictate that course.' Gruber v. Mayor and Township Committee of Raritan Tp., 39 N.J. 1, 13 (1962). In broad terms, it may be said that where a contract is beyond the power of the municipality or where the Legislature has explicitly barred any liability if a restriction upon the exercise of power is not met, relief ordinarily will be denied. [Citations omitted] But if the difficulty is an irregularity in the exercise of a power the municipality does have and the Legislature had not decreed the consequences of the irregularity, our cases seek a just result. In such circumstances, one who deals with the municipality in good faith may be permitted to invoke the concept of ratification." (at p. 463; citations omitted; emphasis added)
Since, under the circumstances of this case, the 1960 board of education may bind successor boards for the specific job involved herein, and since a capital appropriation is not a condition precedent to the validity of the 1960 agreement, summary judgment will be entered for defendant. Accordingly, plaintiff's motion for summary judgment will be denied.
An order should be presented as required by R.R. 4:55-1.