873 A.2d 616 (2005)
377 N.J. Super. 493
The TAX AUTHORITY, INC., Plaintiffs-Appellants,
v.
JACKSON HEWITT, INC., Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted November 29, 2004.
Decided May 17, 2005.
*617 Dilworth Paxson, attorneys for appellant (Stephen P. Pazan, on the brief).
Pitney Hardin and John F. Dienelt and Scott McIntosh (Piper Rudnick) of the Washington, D.C. bar, admitted pro hac vice, attorneys for respondent (Dennis LaFiura, Mr. Dienelt, and Mr. McIntosh, on the brief).
Before Judges CUFF, WEISSBARD, and HOENS.
The opinion of the court was delivered by
*618 WEISSBARD, J.A.D.
Plaintiff The Tax Authority, Inc. (TA) appeals from a December 19, 2003 order enforcing a settlement of litigation between it, other plaintiffs, and defendant Jackson-Hewitt, Inc. (JHI). The settlement was negotiated on behalf of all plaintiffs by a Steering Committee and was submitted for approval to the individual plaintiffs consistent with their individual but identical retainer agreements with the same attorney. Those agreements contained a provision whereby each individual plaintiff agreed to a settlement approved by a weighted majority of plaintiffs. Defendant filed a motion to enforce the settlement when such a weighted majority of plaintiffs accepted the settlement. We hold that the retainer agreement containing the weighted majority provision for settlement of the litigation is contrary to RPC 1.8(g) of the Rules of Professional Conduct (RPCs) and is unenforceable. Consequently, the order enforcing the settlement over plaintiff's objection is reversed.
The plaintiffs in the underlying litigation were 154 entities that own and operate franchises of JHI, a nationwide tax preparation service. As part of their business, plaintiffs make loans to tax filers in anticipation of the filer receiving a refund from the Internal Revenue Service. Thus, during the 2002 tax season, plaintiffs processed over $25 million in Refund Anticipation Loans (RALs). Plaintiffs' amended complaint stated:
Prior to Tax Season 2000, an established course of dealing was created between the parties by which the defendants distributed monetary rebates, called "Performance Incentive Rebates," to the plaintiffs and other eligible JHI franchisees following each and every Tax Season in which a positive balance of funds remained in a reserve account, known as the "Risk Pool," after all delinquent RALs had been paid. In fact, JHI and SBBT [Santa Barbara Bank & Trust][1] and/or other participating banks distributed those funds to the plaintiffs and other eligible JHI franchisees in the form of Performance Incentive Rebates following each and every Tax Season prior to Tax Season 2000 in which the defendants announced that a positive balance of funds remained in the Risk Pool after all delinquent RALs had been paid.
Despite their extensive course of dealing with the plaintiffs and despite repeatedly making specific oral and written representations that such Performance Incentive Rebates would continue to be paid following each and every Tax Season in which a positive balance of funds remained in the Risk Pool, beginning in Tax Season 2000, the defendants quietly discontinued their pattern and practice of issuing Performance Incentive Rebates. Instead of distributing rebates to JHI franchisees, on information and belief, the defendants converted the balance of funds that remained in the Risk Pool following Tax Seasons 2000, 2001 and 2002 to their own respective accounts and/or the accounts of their respective affiliates. On information and belief, as much as $26 to $32 million remained in the Risk Pool after all delinquent RALs had been paid following the 2002 Tax Season alone. The defendants have refused to fully disclose *619 their respective revenue or that of their respective affiliates in connection with JHI's Bank Product Programs, and the defendants have failed to provide an accounting concerning the Risk Pool and other funds generated from the sales of RALs during Tax Seasons 2000, 2001 and 2002.
Essentially, plaintiffs' complaint was that they were entitled to share in rebates from the Risk Pool "to the extent that funds remained in the Risk Pool after delinquent RALs had been paid following each Tax Season beginning in Tax Season 1994 ... to each of the plaintiffs that maintained or maintains a low RAL delinquency ratio during the Tax Season." Plaintiffs' three causes of action against JHI were based on breach of express contract, contract implied-in-fact, and contract implied-in-law.
In their individual franchise agreements, plaintiffs had agreed that any legal action against JHI would not be in the form of a class action. As a result, the complaint named each of the 154 franchisees individually as a plaintiff. The plaintiffs collectively hired Eric Karp, Esq. of Witmer, Karp, Warner & Thoutte (Witmer Karp) of Boston, to represent them. Each plaintiff entered into an attorney-client fee agreement with the firm on or about May 30, 2002. Each fee agreement provided that "the Matter will be pursued by the Attorney on a collective basis with other similarly situated franchisees (hereafter the `Co-Plaintiffs') of Jackson Hewitt, Inc."[2] The fee agreement also appointed a Steering Committee, consisting of four individuals: Robert Phillips, Robert Schiesel, George Alberici, and Kenneth Leese. Leese is the owner of TA, the sole appellant on this appeal. "In order to streamline the matter," the Steering Committee was "empowered to make decisions for the Co-Plaintiffs on all strategic and similar procedural matters other than the decision to settle the matter [as provided in the agreement]." According to a certification of Karp, "[t]he terms and provisions of the fee agreement, including the development of the voting mechanism, were the subject of much discussion and negotiation" between he and the Steering Committee, discussions in which Leese "took the lead."
As to settlement, the fee agreement provided that "[t]he client agrees that the Matter may be resolved by settlement as to any portion or all of the Matter upon a vote of a weighted majority of the Client and all of the Co-Plaintiffs," a quorum being 60% of the votes eligible to be cast. The weighting came about as a result of a provision in the agreement which allowed "[e]ach Plaintiff ... [to] have one vote for each funded RAL for the 2002 Tax Season," and provided that a plaintiff was only eligible to vote if it was current on all its payments pursuant to the fee agreement.
The fee agreement went on to provide for specific circumstances in which the attorney and his firm could terminate their representation of the client, but did not, however, set out the circumstances under which a client could terminate the relationship. Finally, the agreement also provided that:
The Client has been given the opportunity to consult with an attorney outside the Firm about any aspect of this Agreement prior to signing. The Client acknowledges having read this Agreement and signs it freely and voluntarily and accepts the terms hereof.
Plaintiffs collectively filed their complaint in August 2002. That same month, Schiesel passed away. His position on the *620 Steering Committee was not filled as the fee agreement did not provide for any such substitution. None of the plaintiffs contested the issue.
The parties subsequently agreed to mediate the dispute. The mediation took place on June 30 and July 1, 2003 and was mediated by Eric Van Loon (the mediator), an attorney at a Boston firm, JAMS. On July 1, 2003, JHI and the Steering Committee agreed to a settlement in principle, embodied in a single-page agreement (the JAMS Settlement), setting out thirteen specific items comprising the settlement. JHI's representatives and the Steering Committee members, including Leese, signed the JAMS Settlement that same day. Consistent with the attorney-client fee agreement, the JAMS Settlement provided that it was "subject to Plaintiffs Steering Committee obtaining plaintiffs' overall approval as per their agreement," as well as to approval by JHI's Board of Directors. In its brief, JHI asserts that "[d]uring the mediation, JHI was informed of the existence of the `Majority Rules Agreement' when its representatives expressed concern about ensuring that all plaintiffs would be bound by any settlement."
After July 1, Leese asserted that his "involvement with Mr. Karp and the Steering Committee changed," continuing as follows:
6. I began to challenge Mr. Karp regarding certain issues concerning the settlement in principle.
7. Once I began to challenge Mr. Karp, I learned that the remaining members of the steering committee were meeting with Mr. Karp without my knowledge.
8. As a result, I believe that the plaintiff body did not have full representation once the steering committee began meeting without my knowledge or participation.
9. When I learned of this development, I terminated my relationship with Mr. Karp and was no longer a member of the steering committee.
The record does not reveal the date Leese terminated his relationship with Karp and the Steering Committee.
Ultimately, a weighted majority did approve the JAMS Settlement, with TA abstaining from the vote. On October 30, 2003, Karp posted a formal, detailed, nineteen-page Settlement Agreement (the Agreement), which had been negotiated between him and counsel for JHI, on a password protected website, and e-mailed a copy of the Agreement to each plaintiff. Karp requested that each plaintiff return a signed duplicate copy of the Agreement to him by November 12, a deadline later extended to November 17.
On November 21, Karp posted a bulletin on the website, informing his clients that any plaintiff who did not submit a response by December 1 would be presumed to have declined to do so. The communication further stated that it would then be necessary for Karp to seek leave to withdraw as counsel due to a conflict between those plaintiffs that had signed the Settlement Agreement and those that had not. A copy of this memorandum was also e-mailed to each plaintiff on November 21. A November 24, posting to the website reiterated the December 1 deadline and warned that a motion for leave to withdraw as counsel for those who did not sign the Agreement would be filed on December 2.
As promised, on December 2, Karp filed a motion for leave to withdraw as counsel for those plaintiffs who had not returned the signed Agreement as of that date. The twenty-six plaintiffs in question constituted 16.88% of the plaintiffs and 22.64% of the weighted votes. In seeking withdrawal, *621 Karp stated that the interests of those plaintiffs who had not signed the Agreement had become "directly adverse" to those who had signed and that his continued representation would violate RPC 1.7(b) and RPC 1.16(b)(4).[3] On December 3, 2003, JHI filed a motion to enforce the settlement. On December 19, the court, after hearing argument, granted both motions, relieving Karp as counsel for the non-signing plaintiffs[4] and enforcing the settlement over the objection of TA and others.
TA raises the following issues on appeal:
A. The proposed settlement is void because plaintiffs' counsel violated the Rules of Professional Conduct in connection with the settlement.
B. The plaintiff group is not bound by the proposed settlement because plaintiffs' counsel did not have the authority to bind the plaintiff group, and the "majority rules" provision of the retainer agreement does not cure this defect.
C. The settlement agreement cannot be enforced as to the plaintiff group because JHI's reliance on plaintiffs' counsel's representations regarding the majority rules provision was not reasonable.
D. The trial court's decision is internally inconsistent to the extent that it recognizes the constructive discharge of the attorney, but nonetheless forced The Tax Authority to abide by the attorney's advice.
E. In violation of public policy, JHI deprived plaintiffs of the right to participate in class action litigation and therefore should not be rewarded by imposing finality upon unwilling plaintiffs.
F. The plaintiffs' agreement with their attorney was also unenforceable as contrary to public policy, and frustrated by events and conditions arising during the course of representation.
TA argues that it is not bound by the settlement because counsel for the plaintiffs "albeit unintentionally," violated RPC 1.8(g) which provides as follows:
[a] lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients ... unless each client gives informed consent after a consultation that shall include disclosure of the existence and nature of all the claims *622 . . . involved and of the participation of each person in the settlement.[5]
TA contends that the settlement with JHI violated this RPC. As noted, a vote on the proposed settlement was not unanimous, though a majority voted to accept it. As a result, according to TA, though counsel did not have the consent of "each client," he proceeded to participate in effectuating the settlement rather than immediately withdrawing from the representation as required by RPC 1.16(a)(1) or withdrawing from the JAMS Settlement. TA argues that as a result of this alleged breach, "counsel's acts in concluding the settlement are not binding on and cannot be enforced against the Plaintiff Group."
In finding that the settlement should be enforced, the judge stated:
[T]his is a case where the clients, the plaintiffs clearly entered into an agreement with time to reflect. They consulted with Mr. Karp. They could have gone to another attorney and consulted with another attorney, but they clearly agreed that they were going to move forward and they were going to be governed by the majority.
And the majority, the other plaintiffs had a right to rely on that agreement also. They had a right to enter into a representation agreement with Mr. Karp based on a belief that this case was not going to go on for 15 years until [every] last one of them agreed to a settlement, but that when a majority of them agreed, this was going to be over.
And there's a distinctive difference between that kind of a representation agreement and a type where 90 percent have to consent, or as Hayes [v. Eagle-Picher Industries, Inc. 513 F.2d 892 (10th Cir.1975)] seems to say, 100 percent. And it would really be flying in the face of the consenting plaintiffs to allow the dissenters to hold them up after they all agreed, after a chance to reflect and to seek independent representation, they all agreed that they were going to move forward in this way, and they've paid Mr. Karp, I hope. And they have moved the case forward this way.
And to change the mode of operating at this point in the litigation seems to me to be eminently unfair to those other plaintiffs, and it is not fair to J.H.I. either, whether or not they're a third-party beneficiary of this agreement  of the majority rules agreement, they certainly did participate in the settlement of this case thinking that once they got 51 percent or over 50 percent of the plaintiffs to agree with them, that the case was going to be done, and they could write out their checks or whatever it is that they're doing and put this behind them.
Now as I said, there's a substantial amount of money, not only paid in counsel fees on both sides, but also paid for the mediator.
Now the plaintiffs also say that they agreed to do this with the steering committee composed of four people, one of whom died and that this fourth person who unfortunately died, was their person. Now I'm not sure how that changes anything because that person, although maybe [sic] been able to change the settlement agreement had he been there, certainly couldn't have outvoted the steering committee, and certainly couldn't have, with his vote added, certainly couldn't have changed the ultimate *623 outcome. It's also unclear as to when the gentleman died, whether it was before this was negotiated or after, because some of the papers say 2002 and then another set of papers say 2003.
And at any rate, that position was brought up very late in the game, just the last week, I think, as a matter of fact, it hadn't been asserted as a view previously. And for what it's worth, although the issue here is not whether or not to exonerate Mr. Karp, I do want to say for the record that implicit in my ruling is that he did not do anything improper in his representation because if I was of the opinion that he did, then my opinion about the enforceability of the settlement would be different, because I would be making an opinion saying that Mr. Karp did not give his clients the right to object at the appropriate time, but I'm going to enforce it anyway.
And I just want it to be clear that even though Mr. Karp's compliance with the RPCs is not an issue before me that my issue rests on my finding for the purposes of this motion that Mr. Karp did comply with 1.8(g) ....
The fee agreement and the ultimate settlement are, of course, inextricably linked due to the inclusion in the agreement of the weighted-vote, majority rules mechanism. We agree with TA that such an agreement is improper. The potential for conflict of interest on the part of plaintiffs' attorney was built into the arrangement. Indeed, the representation of more than one client in litigation presents "classic danger zones for conflicts of interest." Geoffrey C. Hazard, Jr. & W. William Hodes, The Law of Lawyering § 12.16 at 12-47 (Supp.2004). In our view, the agreement violated the spirit, if not the letter, of RPC 1.8(g). The settlement mechanism clearly contemplated that there could or would be those plaintiffs that did not agree with the settlement terms. Notwithstanding their disagreement, the views of such dissenters could be overridden by the majority. In such instance, there could be no consent, or informed consent, by the dissenting client, as the RPC requires. We reject JHI's suggestion that, by entering into the fee agreement, each plaintiff consented "in advance" to any settlement that was approved by the majority. Such a fiction is not appropriate to a proper interpretation of standards designed to guide the ethics of the legal profession. But see Scott v. Randle, 697 N.E.2d 60, 68 n. 4 (Ind.App.1998) (suggesting that individual group members could "communicate their consent through a unanimously agreed upon spokesperson and decision-maker"). Of course, in this case, the potential for mischief was realized since there was a minority opposed to the settlement.
TA relies on Hayes, which the motion judge found distinguishable. On appeal, defendant again attempts to distinguish Hayes. While we agree that there are distinguishing features, as there are between most cases, we conclude that the Tenth Circuit's rationale is sound. In Hayes, as here, there was a prior agreement between the clients and their attorney that a "majority rule would govern acceptance of a settlement," although three plaintiffs claimed "they had never agreed to be bound by the majority." Hayes, supra, 513 F.2d at 892. On the eve of trial, there was a settlement offer which was accepted by a vote of thirteen to five, the settlement was announced in open court and reduced to a judgment. Id. at 893. After initially vacating its judgment due to the protest of the non-consenters, the District Court judge reconsidered and reinstated the settlement, finding that plaintiffs' attorney had apparent and actual authority to accept the settlement on behalf of his clients. Ibid. The Circuit *624 Court reversed. It ruled that an agreement "which allows a case to be settled contrary to the wishes of the client and without his approving the terms of the settlement is opposed to the basic fundamentals of the attorney-client relationship," since "the attorney is merely an agent for the client in negotiation and settlement." Id. at 894. The court was further troubled by the fact that since the majority vote agreement was entered into before the settlement negotiations,
[i]t is difficult to see how this could be binding on non-consenting plaintiffs as of the time of the proposed settlement and in light of the terms agreed on. In other words, it would seem that plaintiffs would have the right to agree or refuse to agree once the terms of the settlement were made known to them.
[Ibid.]
The Hayes court also perceived an ethical dilemma for plaintiffs' attorney in light of the applicable ethics rule which required "the attorney to refrain from participating in a settlement on behalf of two or more clients unless each of them consents to it. In view of this, it was untenable for the lawyer to seek to represent both the clients who favored the settlement and those who opposed it." Ibid. The court concluded as follows:
We hold that the arrangement presented allowing the majority to govern the rights of the minority is violative of the basic tenets of the attorney-client relationship in that it delegates to the attorney powers which allow him to act not only contrary to the wishes of his client, but to act in a manner disloyal to his client and to his client's interests. Because of this, it is essential that the final settlement be subject to the client's ratification particularly in a non-class action case such as the present one.
[Id. at 894-95.]
JHI and the motion judge distinguish Hayes from the present case in several respects. Here, the plaintiffs had authorized the Steering Committee to negotiate a settlement, a fact not present in Hayes. We find that distinction to be of no moment. It is not the use of a steering committee which we find objectionable but the manner in which the result achieved by the committee is turned into settlement, i.e., by majority vote. Indeed, the fee agreement itself provided that the Steering Committee was not empowered to settle on behalf of the plaintiffs. In addition, in Hayes, nearly a quarter of the plaintiffs objected to the settlement, which took place on the eve of trial, while a much smaller percentage disagreed here. We fail to discern how the number of dissenters or the timing of the settlement bear on the principles involved. Most important, according to the motion judge, was that the Kansas ethics rule applicable in Hayes, differed from RPC 1.8(g) in that it required the client to be advised of "the total amount of the settlement, and of the participation of each person in the settlement," Model Code of Professional Responsibility DR 5-106, before consenting to an aggregate settlement. RPC 1.8(g), on the other hand, only speaks to the client being advised of the nature of "all the claims . . . involved and of the participation of each person in the settlement." Here, as defendant points out, all of the plaintiffs, and particularly TA, through Leese, knew the essential terms of the settlement, as spelled out in the JAMS Settlement. This difference between the Kansas and New Jersey ethics rules misses the point.[6] The critical provision of the *625 RPC is that the client consent to the final settlement. Even assuming sufficient disclosure in this case, the fact remains that the fee agreement settlement mechanism in theory, and as it played out in this case, permitted settlement without consent as to those in the minority. As one court has noted, it is the fact that not all of the clients had consented to the settlement which was critical to the outcome in Hayes. Petition of Mal de Mer Fisheries, Inc., 884 F.Supp. 635, 639-40 (D.Mass. 1995). We find Hayes persuasive on the issue before us.
Knisley v. City of Jacksonville, 147 Ill. App.3d 116, 100 Ill.Dec. 705, 497 N.E.2d 883 (1986), appeal denied, 113 Ill.2d 575, 106 Ill.Dec. 47, 505 N.E.2d 353 (1987), also followed Hayes to the same conclusion. There, the court faced a trial court ruling enforcing settlement of a dispute between sixty-one homeowners as plaintiffs and a construction company and housing authority as defendants, in which plaintiffs claimed that construction of certain buildings would violate applicable zoning ordinances. Id. at 884. Plaintiffs' attorney entered into settlement negotiations with defendants and eventually agreed to a settlement, believing that he had authority from his clients to do so after a meeting with most of them. According to the attorney, the few that did not attend the meeting later agreed to settle. The attorney claimed that the plaintiffs had agreed "`that a majority would control the actions of the group.'" Id. at 885. As a result, after defendants rejected an initial settlement proposal, he contacted a majority of the plaintiffs who agreed to a second settlement proposal. However, "`some people who had been opposed earlier remained opposed.'" Ibid. At a second meeting with plaintiffs, a "controversy arose as to whether the case should be settled," causing the attorney to seek leave to withdraw as plaintiffs' counsel. Ibid. A motion to enforce the settlement was filed by defendants and the attorney was given leave to withdraw. Ibid.
At the hearing on the petition to enforce the settlement, several plaintiffs testified that they and others (a total of six) had voted against the settlement and had not authorized the attorney to settle. Indeed, one of the plaintiffs testified that the vote in favor of majority rule was itself not unanimous. Ibid. The appellate court reversed the trial court's enforcement of the settlement as to those appealing plaintiffs that had opposed it, but affirmed as to those who consented to the settlement, as well as to those who opposed but did not appeal. Id. at 888.
In reaching its conclusion, the court held that the majority rule could not bind plaintiffs who had never consented to it. Id. at 886. More importantly, the court observed that enforcement of the settlement against those who had not agreed to it would be "completely at odds" with DR 5-106, the same rule applicable in Hayes. Id. at 887. Indeed, the court placed considerable reliance on Hayes in reaching its conclusion. Id. at 886-87. In an action joining many plaintiffs, unlike a class action which requires court approval, "a party should not be bound [to a settlement] unless he has specifically agreed to it. Fundamental fairness is violated when a settlement is allowed to bind parties who object and no safeguards have been added to protect their interests." Id. at 888.
Of course, Knisley is distinguishable as well in that the plaintiffs' group had not even been in agreement with respect to the majority rule. Further, the opinion *626 could be read to suggest that the majority rule, if adopted by all plaintiffs, might have estopped the plaintiffs from denying their attorney's apparent authority to settle. Id. at 886. To the extent that Knisley endorses a unanimously agreed to majority rule, we decline to follow it. In general, however, and particularly with regard to its endorsement of Hayes, we find the decision supportive of the result we reach. See also Abbott v. Kidder Peabody & Co., 42 F.Supp.2d 1046, 1050-51 (D.Colo.1999).
We find further support in Joint Opinion 666/14 of the Advisory Committee on Professional Ethics and the Committee on Attorney Advertising. N.J. Ethics Opinion 666, 132 N.J.L.J. 210 (1992). There, the Committees addressed a direct mail solicitation sent to targeted real property owners inviting them to consider an appeal of their tax assessments. One of the terms contained in the solicitation was that,
[b]ecause of the large number of property owners involved, it will be impossible to present for your review and approval any proposed settlement of your case. Therefore, by signing this agreement, you authorize us to settle your case upon such terms and conditions as we, in our professional judgment, deem to be in your best interests.
[Ibid.]
The Committees found this condition to be improper, in violation of RPC 1.8(g), rejecting the attorney's argument that obtaining client approval of a settlement proposal would, under the circumstances, be impractical and cost-prohibitive. "No matter how laudable the intentions or seemingly exigent the circumstances" the client must be the one to decide whether to accept a settlement offer. According to the Committees, a lawyer could not ethically seek the client's advance approval for a settlement even though the attorney deemed the settlement to be in the client's best interests.
Nevertheless, it has been persuasively argued that the prohibition on agreed-in-advance majority rules settlement authority, as interpreted in Hayes, represents neither good law nor good policy. Silver & Baker, supra, 32 Wake Forest L. Rev. at 768-73. The authors argue that litigants should be free to waive the unanimity requirement of RPC 1.8(g); indeed, "it is perverse to deny mass action plaintiffs this option." Id. at 769. They undertake to demonstrate the error in the position taken by the Hayes court, and others, "that nonwaivability derives from agency law." Id. at 770-73. In fact, as they argue, "agency law leaves co-principals free to use any decision rule they please." Id. at 771. RPC 1.8(g)'s "unanimous consent requirement is probably the most significant barrier to settlement in mass lawsuits." Id. at 767. As Judge Weinstein has said, "[t]oo rigid an adherence to formal ethical-legal rules constitutes a violation of the basic rule of ethics itself, requiring a practical regime in which the needs of the public, the parties, and the law are in reasonable balance." Jack B. Weinstein, Ethical Dilemmas in Mass Tort Litigation, 88 Northwestern Univ. L.Rev. 469, 492 (1994).
The authors of a leading text have suggested that whether an advance agreement that majority rules is effective "may depend on how the relationship between the clients themselves is understood. If each client is thought of as an individual only, then RPC 1.8(g) would seem to require the informed consent of each client at the time of the settlement. On the other hand, if it can be said that each client has (validly) agreed to `limited' representation under RPC 1.2(c), or that it is really the group that has retained the lawyer, then the arrangement could perhaps withstand *627 challenge by a disgruntled dissenter." Hazard & Hodes, supra, § 12.16 at 12.50; see also id. at 12.50-.51. The Restatement would allow a lawyer to represent a client notwithstanding a conflict of interest "if each affected client ... gives informed consent to the lawyer's representation. Informed consent requires that the client... have reasonably adequate information about the material risks of such representation to that client." Restatement of the Law, The Law Governing Lawyers § 122 (2000). However, "[c]lient consents to conflicts that might arise in the future is subject to special scrutiny, particularly if the consent is general." Id. at comment d. See also id. at § 128. Clearly, there are advantages to the client in simultaneous representation, as exemplified by this case. See Nancy J. Moore, Conflicts of Interest In The Simultaneous Representation of Multiple Clients: A Proposed Solution To The Current Confusion and Controversy, 61 Tex. L.Rev. 211, 226-27 (1982).
Notwithstanding these strong arguments to the contrary, we decline to carve out an exception to the unanimity requirement for mass action suits such as the one under review. Rather, we agree with the formulation of the appropriate rule as follows:
During the negotiation of an aggregate settlement, the lawyer with multiple clients must confer with all clients and fully disclose all details of the proposed settlement. Every client must then consent before the settlement may be finalized. The lawyer may not seek advance consent or consent by way of a majority vote of the lawyer's multiple clients. The requirements of consultation, disclosure, and consent are intended to prevent lawyers from unduly favoring some clients over others in group settlements, to enable clients to block package deals that benefit the lawyer more than the clients, and to bolster client autonomy in settlement decisions.
[Lawyers' Manual on Professional Conduct (ABA/BNA) 51:375 (1999).]
Given the "deeply ingrained" doctrine "that a lawyer must respect a client's decision not to settle," Silver & Baker, supra, at 773, any change should come from our Supreme Court, which has primary responsibility for attorney ethics, as reflected in the RPC. See Cohen v. Radio-Elec. Officers Union, 146 N.J. 140, 155, 679 A.2d 1188 (1996); Jacob v. Norris, McLaughlin & Marcus, 128 N.J. 10, 17, 607 A.2d 142 (1992). "[A]n attorney's freedom to contract with a client is subject to the constraints of ethical considerations and our supervision." Cohen, supra, 146 N.J. at 155, 679 A.2d 1188. The RPCs "establish the state's public policies with respect to attorney conduct. Contracts that violate the RPCs violate public policy, and courts must deem them unenforceable." Jacob, supra, 128 N.J. at 17, 607 A.2d 142; see also Cohen, supra, 146 N.J. at 156, 679 A.2d 1188 ("An otherwise enforceable agreement between an attorney and client would be invalid if it runs afoul of ethical rules governing that relationship."). As a result, we conclude that the majority rules settlement provision in the fee agreement signed by plaintiff is invalid and enforcement of the settlement on that basis cannot stand.[7]
Nevertheless, defendant contends that plaintiff is estopped to withdraw from the settlement. Indeed, estoppel seemed to be at the heart of the motion judge's *628 decision when she spoke of the unfairness to both defendant and the settling plaintiffs and of the "substantial amount of money" paid in counsel fees and for mediation. Before addressing this issue, we note our disagreement with defendant's attempt to restate plaintiffs' argument as being that "governing ethics rules require that a party who participates in a collective settlement must be advised of the amount he will receive before he consents to the settlement, or the party will not be bound by the settlement." From this premise, defendant argues that since Leese, as a member of the Steering Committee, knew what TA's share of the settlement would be when he "approved the settlement and signed the JAMS Settlement Agreement," he is estopped to withdraw from the settlement.[8] We do not agree. Clearly, to give an informed consent to a settlement, even in the context of a majority vote provision, a client must either know the amount he will receive or be able to calculate that amount by reference to some previously agreed upon formula. TA's argument is not, as we understand it, that Leese did not have that essential knowledge but that TA ultimately declined to accept the JAMS Settlement to which, as a member of the Steering Committee, Leese had agreed in principle on July 1, 2003. That, in turn, leads to the question whether Leese, by his conduct, is estopped to eschew the settlement.
Equitable estoppel, sometimes referred to as estoppel in pais, requires conduct by one party done "intentionally or under such circumstances that it was both natural and probable that it would induce action. Further, the conduct must be relied on, and the relying party must act so as to change his or her position to his or her detriment." Miller v. Miller, 97 N.J. 154, 163, 478 A.2d 351 (1984). "It is a doctrine designed to prevent a party's disavowal of previous conduct if such repudiation `would not be responsive to the demands of justice and good conscience.'" Carlsen v. Masters, Mates & Pilots Pension Plan Trust, 80 N.J. 334, 339, 403 A.2d 880 (1979) (quoting W. Jersey Title & Guar. Co. v. Indus. Trust Co., 27 N.J. 144, 153, 141 A.2d 782 (1958)). Stated differently, it is "an equitable doctrine, founded in the fundamental duty of fair dealing imposed by law, that prohibits a party from repudiating a previously taken position when another party has relied on that position to his detriment." Casamasino v. City of Jersey City, 158 N.J. 333, 354, 730 A.2d 287 (1999) (quoting State v. Kouvatas, 292 N.J.Super. 417, 425, 678 A.2d 1178 (App.Div.1996)). Thus, it is not necessary that fraudulent intent be shown but only that the conduct "works an unjust or inequitable result to the person it was designed to influence." Widmer v. Tp. of Mahwah, 151 N.J.Super. 79, 85, 376 A.2d 567 (App. Div.1977) (quoting N.J. Suburban Water Co. v. Harrison, 122 N.J.L. 189, 194, 3 A.2d 623 (E. & A.1939)). See also Miller v. Bd. of Tr. of Teachers' Pension & Annuity Fund, 179 N.J.Super. 473, 477, 432 A.2d 560 (App.Div.), certif. denied, 88 N.J. 502, 443 A.2d 714 (1981). However, the doctrine is applied "only in very compelling circumstances," Palatine I v. Planning Bd., 133 N.J. 546, 560, 628 A.2d 321 (1993) (quoting Timber Prop., Inc. v. Chester Tp., 205 N.J.Super. 273, 278, 500 A.2d 757 (Law Div.1984)), disapproved of on other grounds, D.L. Real Estate Holdings *629 v. Point Pleasant Beach Planning Bd., 176 N.J. 126, 134-35, 820 A.2d 1220 (2003), "where the interests of justice, morality, and common fairness clearly dictate that course." Ibid. (quoting Gruber v. Mayor and Tp. Comm. of Raritan Tp., 39 N.J. 1, 13, 186 A.2d 489 (1962)).
We see no basis for an estoppel based upon Leese's conduct in signing the JAMS Settlement and then disavowing it. We do not construe Leese's signing on July 1, 2003 as an irrevocable acceptance of the settlement terms on behalf of TA. The fee agreements signed by each plaintiff explicitly stated that the Steering Committee could decide all matters other than the decision to settle. As a result, the signing of the JAMS Settlement by the Steering Committee members could only be seen as a decision to submit the terms proposed by the mediator to the plaintiffs for their vote. Contrary to JHI's assertion, the Steering Committee had no authority to bind the plaintiffs to a settlement.[9] Indeed, the JAMS Settlement explicitly recognized that fact, as well as the fact that the settlement was subject to approval of JHI's Board of Directors. Thus, the JAMS Settlement was tentative at best and defendant could not have been misled into thinking otherwise. It was always a real possibility that the weighted majority would not approve the settlement. And it was clear quite soon after the voting deadline had passed that a small number of plaintiffs did not agree to the settlement terms as proposed in the JAMS Settlement.
Nor do we view Leese's conduct, on behalf of TA, as constituting a repudiation of a previously taken position, such as to give rise to an estoppel. Further, we see no detrimental reliance by JHI on Leese's conduct in signing the JAMS Settlement. It is true that JHI proceeded to negotiate the final Settlement Agreement with Karp, but that was in reliance upon the majority vote approving the settlement, which we have determined is unenforceable, not on Leese's conduct as a member of the Steering Committee. JHI refers to "the cost and potential distraction of resuming litigation with [TA]." But that consequence, as we have noted, was always a possibility if the settlement was not approved. In that respect, Leese stands in no different position than any other plaintiff that voted against the settlement. We see nothing in these facts to constitute the "very compelling circumstances," Palatine I, supra, 133 N.J. at 560, 628 A.2d 321 (quoting Timber Prop., Inc., supra, 205 N.J.Super. at 278, 500 A.2d 757), in which estoppel is "clearly dictate[d]" by the "interests of justice, morality, and common fairness," ibid. (quoting Gruber, supra, 39 N.J. at 13, 186 A.2d 489).
As a result of our disposition, we see no need to address TA's argument that the provision in its franchise agreement with JHI that required it to forego class action litigation against JHI violated public policy. We note, however, that we have previously rejected the argument that a similar provision contained in an arbitration agreement was unenforceable because it had a "detrimental impact on consumers' rights." Gras v. Assoc. First Capital Corp., 346 N.J.Super. 42, 51-52, 786 A.2d 886 (App.Div.), certif. denied, 171 N.J. 445, 794 A.2d 184 (2001). Similarly, we need not address TA's argument that this case should be treated as a de facto class action, requiring a fairness hearing. See R. 4:32-4; see also Chattin v. Cape May Greene, Inc., 216 N.J.Super. 618, 626-28, 524 A.2d 841 (App.Div.), certif. denied, 107 N.J. 148, *630 526 A.2d 209 (1987). While we have earlier expressed the view that plaintiff's counsel should have withdrawn as attorney for all plaintiffs, see infra note 4, counsel for the plaintiffs in a class action is not similarly constrained, and may continue to represent the class even in the face of dissenters from the class, a subject exhaustively discussed in In re M & F Worldwide Corp. Shareholders Litigation, 799 A.2d 1164, 1172-77 (Del.Ch.2002).
To summarize, the judge bound TA to a settlement to which it did not consent, pursuant to a majority vote agreement which we conclude is unenforceable. While it is indeed regrettable that one of 154 plaintiffs may possibly upset a settlement as to which all others have now agreed, we see no principled basis upon which to require TA to settle when it does not wish to do so, nor does the conduct of its representative compel that result. Our strong public policy in favor of settlements, Nolan v. Lee Ho, 120 N.J. 465, 472, 577 A.2d 143 (1990), is in this instance outweighed by the public policy embodied in RPC 1.8(g).
Reversed and remanded for further proceedings.
NOTES
[1] Pacific Capital Bank, N.A., a National Banking Association d/b/a Santa Barbara Bank & Trust (SBBT) was named as a defendant, along with JHI, in plaintiffs' complaint. The record does not reveal what happened to SBBT in the litigation. The mediation efforts and subsequent settlement only appear to involve JHI.
[2] By agreement between the parties, we have only been provided with a copy of TA's fee agreement with Witmer Karp. We assume the others were the same.
[3] In connection with his motion, Karp submitted a supplemental certification dated December 17, 2003, which spelled out in greater detail events taking place before the fee agreements were signed and after the mediation took place. That supplemental certification was included in TA's appendix provided to us but was, by agreement between the parties, subsequently withdrawn, apparently out of concern that it might have trespassed upon the attorney-client privilege, at least between Karp and those plaintiffs that voted to accept the settlement. Accordingly, we have made no reference in this opinion to facts contained in the supplemental certification.
[4] Karp originally sought to be relieved as to twenty-six plaintiffs. Between the filing of his motion and argument in the Law Division, eight of those twenty-six had signed the Settlement Agreement. As a result, at the time the motion was argued, there were fourteen plaintiffs who opposed the settlement and were represented by counsel. An additional four plaintiffs had not signed the Settlement Agreement but were unrepresented at the motion and were considered to be in opposition.

After being relieved as counsel for the non-signing plaintiffs, Karp continued to represent the signing plaintiffs, arguing for enforcement of the settlement. Although not raised by TA, we are of the view that Karp should have withdrawn as counsel for all plaintiffs since his position favoring settlement had placed him in an adverse relationship to some of his former clients. See RPC 1.16(a)(1), 1.7(a), 1.9(a). We express no opinion on whether Karp moved to be relieved at the earliest time his conflict became apparent.
[5] At the time of argument in the Law Division, the RPC contained only the requirement that "each client consents after consultation." The Rule was amended, effective January 1, 2004, to include the necessity for "informed consent."
[6] As a recent article has noted, this difference between DR 5-106 and RPC 1.8(g), does not have much practical significance, since the total size of the settlement is generally disclosed. Charles Silver & Lynn A. Baker, Mass Lawsuits and the Aggregate Settlement Rule, 32 Wake Forest L.Rev. 733, 734 n. 4 (1997).
[7] We need not discuss TA's argument that the "weighted" provision of the agreement is independently invalid in that it fails to treat all parties on the same side of the dispute equally, giving greater "clout" to some based essentially on their volume of business as reflected in the RALs.
[8] We fail to discern the basis for JHI's suggestion that Leese, and the other Steering Committee members, had more knowledge of the settlement terms than did the other plaintiffs. The terms, including the cash portion of the settlement, were set out in the JAMS Settlement which was provided to all the plaintiffs before their vote. We find nothing to suggest that Leese had more information than anyone else.
[9] As a result, this case is not governed by decisions that bind a party to a settlement reached by its attorney pursuant to authority granted to the attorney. See Amatuzzo v. Kozmiuk, 305 N.J.Super. 469, 475-76, 703 A.2d 9 (App.Div.1997).